896 F.Supp. 1522 (1995)
GAMBRO LUNDIA AB, Plaintiff,
v.
BAXTER HEALTHCARE CORPORATION, Defendant.
No. 92-C-574.
United States District Court, D. Colorado.
August 18, 1995.
*1523 *1524 *1525 Willem G. Schuurman, Austin, TX, for plaintiff.
Timothy J. Malloy, McAndrews, Held & Malloy, Chicago, IL, for defendant.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
CARRIGAN, District Judge.
Plaintiff, Gambro Lundia AB (Gambro), a manufacturer of hemodialysis equipment, commenced this action against one of its competitors, Baxter Healthcare Corporation (Baxter). Gambro alleges that certain hemodialysis monitors manufactured by Baxter infringe claim 1 of its United States Patent No. 4,585,552 (the Gambro '552 patent). Baxter has raised a series of affirmative defenses and has asserted a counterclaim seeking declaratory judgments of patent invalidity and unenforceability.
Trial to the court on the liability issues has been completed, and those issues are ripe for decision. Jurisdiction exists under 28 U.S.C. § 1338(a). This memorandum constitutes the court's findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).

I. BACKGROUND.

A. Background of Hemodialysis Technology.

Hemodialysis systems remove blood contaminants and excess water from a patient's blood when the patient's kidneys are not capable of performing that function adequately.[1] Without dialysis, such a patient may die within a short time.
During a typical dialysis treatment, a manmade dialysis solution called dialysate is passed through a device known as a dialyzer, which acts as an artificial kidney. The dialysate is passed on one side of a porous diffusion membrane in the dialyzer. The patient's blood is passed on the other side of the membrane. The difference between the dialysate pressure and that of the patient's blood is called the transmembrane pressure. Toxic molecules and excess water, collectively called ultrafiltrate, diffuse from the patient's blood through the pores in the membrane into the dialysate. Thus the volume of the spent dialysate (as enhanced by the added impurities and water) flowing out of the dialyzer is greater than the volume of fresh dialysate entering the dialyzer. The difference is the ultrafiltrate. The rate at which ultrafiltrate is removed from the patient's blood may be controlled by varying the transmembrane pressure. (See Diagram 1.)
*1526 
It is medically critical to measure accurately and to control precisely the amount of ultrafiltrate removed from a patient's blood during dialysis. If too much or too little ultrafiltrate is removed, the patient may suffer serious or even fatal consequences.
One method for measuring the amount of ultrafiltrate removed from a patient is to place a first flow sensor at the input to the dialyzer and a second flow sensor at the output from the dialyzer. (See Diagram 2.) The difference between the rate of dialysate flow into the dialyzer and the rate of dialysate flow out of the dialyzer equals the ultrafiltration rate. The total amount of ultrafiltrate removed from the blood may be calculated by multiplying the ultrafiltration rate by the treatment time. This technology and procedure for measuring the amount of ultrafiltrate removed from a patient, known as flowmetric measurement, was well known long before issuance of the patent here in dispute.
*1527 

B. Development of Gambro's Ultrafiltration Monitor.

In the late 1970's and early 1980's, errors in measuring the ultrafiltrate removed during dialysis were common. Early measurement systems used "weighbeds." These contrivances were used in a process that measured the patient's weight before, during, and after dialysis, then relied on the patient's weight loss to indicate the amount of ultrafiltrate removed from the patient during a treatment. This method of monitoring ultrafiltrate removal proved expensive, cumbersome, and inaccurate. Various researchers working independently during that time period attempted to solve these problems by developing alternate ultrafiltration monitor and control systems.
The first commercially available improvement after weighbeds was developed by Repgreen Limited, a British company. The Repgreen ultrafiltration monitoring system, known as the UFM 1000, was based upon the research of Prof. Michael Sanderson, and was developed under the supervision of Keith Wittingham, Repgreen's chief designer from 1972 until 1979. The UFM 1000, first available in late 1977, incorporated a flowmetric system that utilized two electromagnetic flow sensors to measure the difference between the rates of flow of dialysate flowing into and out of the dialyzer.
To ensure accuracy, the UFM 1000 provided for recalibration of the electromagnetic flow sensors prior to each dialysis treatment. Its recalibration involved inserting a hose between the first and second flow sensors in place of the dialyzer, thus directing an equal flow of clean dialysate through both flow sensors. The flow sensors were then recalibrated to reflect this equal flow, and more accurate measurements of ultrafiltrate were achieved. This procedure was described in a manual that accompanied each UFM 1000.
During 1979, Repgreen was contacted by Gambro in connection with the latter's efforts to develop an accurate ultrafiltration monitor for use with its dialysis machines. After Repgreen was liquidated in July 1979, Gambro purchased certain Repgreen assets, including *1528 rights to the UFM 1000 monitor. A version of the UFM 1000 was sold by Gambro as the Gambro UFM 10-1. However Gambro was dissatisfied with the UFM 10-1's monitoring system and attempted to develop an improved monitor. Specifically, Gambro attempted to correct a "drift" in the flow sensors that resulted in the UFM 10-1 monitoring system becoming less accurate as a treatment progressed. This drift was caused by a variety of phenomena, including the fact that contaminants removed from the patient's blood during dialysis collected on the downstream or second flow sensor, significantly affecting its accuracy.
At the time of Gambro's alleged invention, it was well known that pretreatment recalibration of flow sensors was necessary. However, contaminants removed from a patient's blood during dialysis collect on the downstream flow sensor during the course of a single dialysis treatment. Pretreatment recalibration could not address this problem.
No earlier than June 1982, four engineers at Gambro headquarters in SwedenBengt-Ake Gummesson, Sven Jonsson, Ulf Mattisson, and Bengt Holmberg  allegedly invented a system whereby measurement inaccuracies that occur during dialysis in the flow sensor downstream from the dialyzer can be rectified. Their alleged invention is disclosed by the Gambro '552 patent here at issue.
Gambro's alleged invention provides for activating valves that direct the clean dialysate's flowpath through the first flow sensor and around the dialyzer then through the second flow sensor. During this recalibration process, the spent dialysate  i.e., dialysate contaminated with ultrafiltrateis prevented from flowing from the dialyzer through the second flow sensor. Because the same clean dialysate fluid stream passes through both flow sensors, the measured difference in the rate of flow can be used as a reference for subsequent recalibration of the flow sensors. In this way, the flow sensors can be recalibrated, not only before dialysis begins, but also at intervals during the dialysis treatment to adjust for any inaccuracies in the second flow sensor attributable to the accretion of blood impurities on its walls. (See Diagram 3.)
*1529 
The alleged Gambro invention was the first system designed to correct for errors in ultrafiltration measurement by recalibrating flow sensors during dialysis treatment.

C. Prosecution of the Gambro '552 Patent.

The original foreign patent application for Gambro's alleged invention was filed in Sweden on September 28, 1982. In September 1983, Gambro filed, in the United States, the application that led to the Gambro '552 patent here at issue. The original U.S. application was amended a number of times before issuance, in April 1986, of the Gambro '552 patent under the title: "System for the Measurement of the Difference Between Two Fluid Flows in Separate Ducts."
Arnold Krumholz was the American attorney responsible for prosecution of the Gambro '552 patent application. Gunnar Boberg *1530 was Gambro's in-house patent attorney responsible for the prosecution.

D. Baxter's Development of its Allegedly Infringing Products.

A separate company, Extracorporeal, Inc., manufactured dialysis equipment during the 1970's and early 1980's. It introduced the SPS 350 dialysis machine in the late 1970's. At that time, the SPS 350 had no ultrafiltration monitoring capability.
By March 1982, Extracorporeal introduced the DM 358 ultrafiltration monitor for use with the SPS 350. The DM 358 used a flowmetric system incorporating two turbine flow sensors, one upstream and one downstream of the dialyzer, for measuring the ultrafiltration rate.
The DM 358, like the Repgreen UFM 1000, provided for flow sensor recalibration before each dialysis treatment (but not during treatment). Recalibration involved disconnecting the dialysate lines from the dialyzer and attaching them to a shunt, or "sanitize/normalize interlock," thus directing the same flow of clean dialysate through both the first and second flow sensors. The DM 358 could then be recalibrated to compensate for any difference in the flow sensor measurements. Because recalibration required disconnecting the dialyzer, the DM 358 was not designed to be recalibrated while a treatment session was ongoing.
In 1984, Baxter acquired the dialysis equipment division of Extracorporeal, and soon thereafter introduced the DM 458 ultrafiltration monitor. Like the DM 358, the DM 458 was not designed to be recalibrated during ongoing treatment.
Baxter was not satisfied with the accuracy of the DM 358 and DM 458 ultrafiltration monitors. Its employees spoke with its customers and became more acutely aware of their urgent need for improved ultrafiltration accuracy. This need for improved ultrafiltration monitoring accuracy led to development of the Baxter SPS 550, the equipment here accused of infringing Gambro's patent.
Baxter began marketing the SPS 550 in December 1987. It differs from the DM 458 and DM 358 primarily by incorporating four, rather than two, turbine flow sensors, two for measuring dialysate flowing into the dialyzer and two for measuring dialysate flowing out of the dialyzer. The SPS 550 also utilizes a more powerful microprocessor than the DM 358 and DM 458. These components are parts of a sophisticated ultrafiltration monitor and control system capable of performing automatic recalibration during dialysis treatments. This system, called the "Auto-Adjust Fluid Removal System," provides much more accurate ultrafiltration monitoring and control than Baxter's earlier products.

II. ANALYSIS.

A court may and indeed should inquire into both validity and infringement to avoid imposing upon the parties the burden of a remand. Innovative Scuba Concepts, Inc. v. Feder Indus., Inc. 819 F.Supp. 1487, 1496 (D.Colo.1993). This burden proves especially onerous where, as here, the trial has been extended, the evidence extensive, and the issues complex and interwined. Accordingly, I will decide all issues reasonably pertinent to determining the validity of the Gambro '552 patent and Baxter's alleged infringement. This includes several issues that are perhaps unnecessary to the court's holding here, but that may prove relevant upon appeal.

A. Patent Infringement.

Gambro asserts that the Baxter SPS 550 and SPS 1550 infringe claim one of its '552 patent either literally or through the doctrine of equivalents. The ultrafiltration systems in the SPS 550 and SPS 1550 are functionally identical. The parties have agreed that the two systems are subject to the same analysis for purposes of the infringement claim and that they may be referred to collectively as the SPS 550.
Section 271(a), 35 U.S.C., provides that "whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefore, infringes the patent." An infringement analysis requires two inquiries: (1) interpretation of the patent to determine the claim's scope, and (2) a finding whether the claim encompasses the accused device. Texas Instruments, Inc. v. United States Int'l Trade Comm'n, 805 F.2d 1558, 1562 *1531 (Fed.Cir.1986), reh'g denied, 846 F.2d 1369 (Fed.Cir.1988). Infringement must be proven by a preponderance of the evidence. ZMI Corp. v. Cardiac Resuscitator Corp., 844 F.2d 1576, 1582 (Fed.Cir.1988).
Claim interpretation involves questions of law. Hormone Research Found., Inc. v. Genentech, Inc., 904 F.2d 1558, 1562 (Fed.Cir.1990), cert. dismissed, 499 U.S. 955, 111 S.Ct. 1434, 113 L.Ed.2d 485 (1991). To ascertain the meaning of a patent claim, three sources are to be considered: the patent's "claim," its "specification," and its prosecution history. Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed.Cir. 1995).
The patent's claims provide the inventions's formal definition. Autogiro Co. of America v. United States, 384 F.2d 391, 395, 181 Ct.Cl. 55 (1967). They consist of numbered paragraphs that "particularly [point] out and distinctly [claim] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112. The patent's specification describes the manner and process of making and using the invention so that a person skilled in the patent's art may utilize it. Autogiro, 384 F.2d at 397. The specification aids in ascertaining the scope and meaning of a claim inasmuch as it is expected that words are used with the same meaning in both the claim and the specification. Id.
The court may also consider expert testimony, including evidence of how those of ordinary skill in the art would interpret the claim. Markman, 52 F.3d at 979. Further, a claim must be read in view of the specification. Id. However, the specification does not set forth the limitations of a claim; rather, limitations must be set forth in the claim itself. Id. at 980. One or more of a claim's limitations "may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶ 6.
Whether a claim encompasses an accused device is a question of fact. Vaupel Textilmaschinen KG v. Meccanica Euro Italia Spa, 944 F.2d 870, 879 (Fed.Cir.1991). To establish literal infringement, a plaintiff must show that the accused device embodies every limitation of the patent claim as properly interpreted. Mannesmann Demag Corp. v. Engineered Metal Prods. Co., 793 F.2d 1279, 1282 (Fed.Cir.1986). To determine whether a means-plus-function limitation is met literally, "the court must compare the accused structure with the disclosed structure, and must find equivalent structure as well as identity of claimed function for that structure." Pennwalt Corp. v. Durand-Wayland, Inc., 833 F.2d 931, 934 (Fed.Cir. 1987), cert. denied, 485 U.S. 961, 1009, 108 S.Ct. 1226, 1474, 99 L.Ed.2d 426, 703 (1988) (emphasis in original).
Claim one of the Gambro '552 patent provides:
[element one] In dialysis equipment including a dialyzer, a system for measuring the difference in the rate of flow between first and second fluid streams, said first fluid stream comprising clean dialysis solution flowing to the dialyzer and said second fluid stream comprising spent dialysis solution flowing from the dialyzer, said system comprising
[element two] a first duct for receiving said first fluid stream flowing therethrough,
[element three] a second duct for receiving said second fluid stream flowing therethrough,
[element four] measuring means for measuring the difference in the rate of flow between said first and second fluid streams within said first and second ducts,
[element five] and transferring means for preventing the flow of said second fluid stream through said second duct while flowing said first fluid stream through both said first and second ducts without passing said first fluid stream through the dialyzer and without altering said rate of flow of said first fluid stream between said first and second ducts such that said rate of flow of said first fluid stream through said first and second ducts is substantially equal,

*1532 [element six] whereby the measured difference of the rate of flow of said first fluid stream flowing through said first and second ducts is adaptable as a reference.
(Exh. 1.) (Formatting and element designations added.)
It is undisputed that the accused Baxter SPS 550 is a system for measuring the difference between the respective rates of flow of dialysate flowing into and out of a dialyzer. It is also undisputed that the Baxter machine includes ducts for receiving the dialysate flowing into and out of the dialyzer. Thus, I find and conclude that the Baxter 550 embodies the first three elements of claim one of the Gambro '552 patent.
The term "measuring means," in element four, is a means-plus-function description of a structure the function of which is to measure the flow difference between the first and second ducts. The expert witnesses at trial agreed that the structure in the Gambro '552 patent's specification that corresponds to this description is a system comprised of electro-magnetic flow sensors connected to differential measuring units, which are in turn connected to a microcomputer. This structure is disclosed in figure one of the patent. (See Diagram 4.)

*1533 The Baxter machine uses turbine flow sensors rather than electromagnetic flow sensors to measure flow differences. However, based on the unrefuted testimony of George Eilers, an expert in dialysis ultrafiltration measurement and control, I find that these turbine flow sensors, in conjunction with the SPS 550's microcomputer, are equivalent structures performing an identical function  measurement of the difference in the rate of dialysate flow  to the structures described in the specification of the Gambro '552 patent. Accordingly, I find and conclude that the Baxter SPS 550 embodies the limitations described by the fourth element of claim one.
Element five presents a means-plus-function description of a "transferring means" for re-routing the flow of clean dialysate from the first flow sensor to the second flow sensor by detouring its flow so that it does not pass through the dialyzer. The transferring means must also function to interrupt the flow of spent dialysate so that it does not pass through the second flow sensor during the recalibration process. Element five thus ensures that a substantially equal flow of the same stream of clean dialysate passes through both the first and second flow sensors.
Gambro contends that element five also requires that the transferring means be designed to operate during dialysis. I agree. As described in element five, one of the transferring means' functions is to prevent the flow of spent dialysate into the second flow sensor. Spent dialysate is generated, and flows from the dialyzer, only during dialysis. Thus, I find and conclude that the transferring means described by element five must be designed to operate during dialysis.
Baxter contends that the Gambro '552 patent fails to disclose a structure that corresponds to the functions described in element five. However, I conclude, based upon Mr. Eilers's expert testimony and my own interpretation of the patent language, that such a structure is disclosed by figures one and three. Figure three of the Gambro '552 patent is a schematic diagram, the bottom half of which depicts the flow path's structure when element five's transferring means is employed. (See Diagram 5.)
*1534 
Figure one of the Gambro '552 patent illustrates that the invention's preferred embodiment includes a computer connected to one or more valves. Mr. Eilers testified that, when read by people of ordinary skill in the art, figures one and three together disclose a structure comprised of computer controlled valves that direct clean dialysate through duct one and then directly through duct two, without passing the dialysate through the dialyzer. Further, the system's valve configuration prevents spent dialysate from passing through duct two. Thus, the system directs an equal flow of clean dialysate through the first and second ducts. Mr. Eilers further testified that, because this system is operated by computer-controlled valves, it is designed to function during a dialysis treatment.
Baxter also asserts that if the Gambro '552 patent does disclose a structure corresponding to element five, this structure does not *1535 include valves or a computer. In support of this contention, Baxter offered the testimony of Prof. William Durgin, an expert in the field of differential fluid mechanics. Prof. Durgin noted that figure three does not contain any symbols for valves. He thus concluded that the transferring means need not include valves. However, the preferred embodiment disclosed by figure one does include computer controlled valves. The only possible use disclosed by the Gambro '552 patent for such valves is the fluid re-routing and transfer described in element five. Accordingly, I find and conclude that the structure corresponding to element five includes computer controlled valves.
Baxter contends that, because figure three discloses a structure routing spent dialysate to a drain, such a structure also is required by element five. Line 24 of figure three does disclose that the spent dialysate can be routed to a drain when the dialyzer is bypassed. However, the functions disclosed by element five include: (1) transferring the flow of clean dialysate from the first duct to the second duct while bypassing the dialyzer; (2) preventing the flow of spent dialysate through the second duct; and (3) permitting a substantially equal flow of dialysate through the first and second ducts during dialysis. Carrying spent dialysate out of the system to a drain is in no way necessary to any of these functions. Therefore, I find and conclude that a structure routing spent dialysate to a drain is not required by element five.
Having determined the scope of element five of claim one, it is clear that it is encompassed by the Baxter SPS 550. According to the testimony of Tom Hartranft, one of the SPS 550's designers, the 550 contains a "bypass valve" for transferring the flow of clean dialysate from the first duct to the second duct without passing the dialysate through the dialyzer. The SPS 550 further includes an "isolation valve" to prevent the flow of spent dialysate to the second duct. In this way, the SPS 550 provides a substantially equal clean dialysate flow through the first and second ducts. Finally, Mr. Hartranft admitted that the SPS 550 was designed to isolate the dialyzer during the course of a dialysis procedure by means of the computer controlled bypass and isolation valves. Accordingly, I find and conclude that the SPS 550 embodies the limitations disclosed by element five of claim one.
Element six of claim one requires that "the measured difference" of the flow rates in the two ducts be "adaptable as a reference." Baxter argues that its SPS 550 does not embody the limitations disclosed in this element for the asserted reason that it does not use the measured difference as a new zero value for continued flow measurement. Rather, Baxter contends, its machines refer to the measured difference only to ascertain whether the machine is losing fluid (a process referred to as "leak detection"), and to verify whether flow sensor recalibration is necessary (a process known as "calibration verification").
The specification of the Gambro '552 patent states that the measured difference of the flow between the first and second ducts can be used as a new zero point for continued measurement. Element six, however, merely requires that the measured difference be adaptable, or available, as a reference. Mr. Hartranft admitted that Baxter's SPS 550, in performing leak detection and calibration verification, compares the measured difference between the flow in the first and second ducts to preset values. Thus, the Baxter SPS 550 clearly uses the measured difference between the flow in these ducts as a reference. Accordingly, I find and conclude that the SPS 550 embodies the limitations set forth in element six of claim one.
In summary, the Baxter SPS 550 embodies every limitation set forth in claim one of the Gambro '552 patent. Accordingly, I find and conclude that the Baxter SPS 550 literally infringes that claim.

B. Baxter's Defenses Asserting Patent Invalidity.

Baxter has raised numerous defenses questioning the legitimacy of the Gambro '552 patent. Baxter contends that the patent is invalid on the basis of (1) anticipation, (2) obviousness, (3) derivation, (4) indefiniteness, (5) inequitable conduct, and (6) failure to disclose best mode.
Once issued, a patent is presumed valid, and the party asserting invalidity has the burden of establishing it. 35 U.S.C. *1536 § 282. Invalidity must be proved by clear and convincing evidence. Verdegaal Bros., Inc. v. Union Oil Co., 814 F.2d 628, 631 (Fed.Cir.), cert. denied, 484 U.S. 827, 108 S.Ct. 95, 98 L.Ed.2d 56 (1987).

1. Anticipation.
Section 102, 35 U.S.C., recognizes the "anticipation" defense by providing:
A person shall be entitled to a patent unless 
(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or
(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.
A claim is anticipated if each and every element set forth in the claim is found, either expressly or inherently described, in a single prior art reference. Verdegaal Bros., 814 F.2d at 631. Anticipation is a question of fact. Allen Archery, Inc. v. Browning Mfg. Co., 819 F.2d 1087, 1091 (Fed.Cir.1987).
Baxter contends that claim one of the Gambro '552 patent is anticipated by three prior art references: (1) the Extracorporeal DM 358 ultrafiltration monitor; (2) the Repgreen UFM 1000 ultrafiltration monitor and accompanying manual; and (3) the German '756 patent. Thus, I must consider whether any one or more of these prior art references embody each and every element of claim one.
All three prior art references reveal systems for measuring the difference in the rate of flow between dialysate streams flowing into and out of a dialyzer. Further, each reference contains a set of first and second ducts for carrying the dialysate streams. Thus, I find and conclude that these prior art references embody the limitations of claim one's first three elements.
As noted previously, element four of Gambro's claim one describes a "measuring means," the functions of which are to measure the dialysate flow rates through the first and second ducts, respectively, and calculate the difference between those two rates. The structure in the Gambro '552 patent that corresponds to this description is a system of electromagnetic flow sensors connected to differential measuring units that in turn are connected to a microcomputer. Where the difference between the two flow rates is slight, the difference is measured directly by the differential measuring units. Where the difference is greater, it is calculated by the microcomputer.
The Extracorporeal DM 358 and the Repgreen UFM 1000 employ similar systems for measuring the difference in flow rates. According to Mr. Hartranft, the DM 358 uses turbine flow sensors identical to those used in the Baxter SPS 550 to measure the dialysate flow rates in the first and second ducts.[2] The DM 358 then utilizes a microcomputer to calculate the difference between those two rates.
Keith Wittingham, formerly chief designer for Repgreen, testified that the UFM 1000 uses electromagnetic flow sensors to measure the dialysate flow rates in the first and second ducts. Although the UFM 1000 does not use a digital microcomputer to calculate the difference in the flow rates, it includes analog electronics capable of calculating that difference. Consequently, I find and conclude that the DM 358 and UFM 1000 contain equivalent structures performing functions identical to the measuring means disclosed by the Gambro '552 patent. Accordingly, I find and conclude that the DM 358 and UFM 1000 embody the limitations described by element four of claim one.
The structure for measuring the difference in dialysate flow rate disclosed in the German '756 patent consists of two glass "rotameters" in the first and second ducts, respectively, plus a prism, a scale, and a rack and pinion system. An observer can measure the *1537 difference between the dialysate flow rates in the first and second ducts by manually adjusting the rack and pinion system so as to align the two rotameters. The difference between the flow rates in the two ducts is displayed on the scale.
However the German '756 patent, unlike the Gambro '552 patent, the DM 358, and the UFM 1000, describes no microcomputer or other electronic mechanism to calculate the flow rate difference automatically. Rather, this calculation is performed manually by the human observer. Accordingly, I find and conclude that the measuring means disclosed by the German '756 patent is not an equivalent structure performing a function identical to that performed by the measuring means disclosed in the Gambro '552 patent. Thus, I find and conclude that the German '756 patent does not embody the limitations described by element four of claim one of the Gambro patent.
The fifth element of Gambro's claim one describes a "transferring means." The structure corresponding to this description is a system of computer controlled valves that can be adjusted to direct the same stream of clean dialysate through duct one and then through duct two, thus sending an equal flow of clean dialysate through the first and second flow sensors.
Baxter contends that the Extracorporeal DM 358 discloses an equivalent structure performing an identical function. The DM 358 structure includes a "sanitize/normalize interlock," or shunt, that is manually inserted into the system in place of the dialyzer to send an equal flow of clean dialysate through the first and second flow meters. Thus, while the structure disclosed by the Gambro '552 patent utilizes computer controlled valves to transfer the flow of dialysate, the DM 358 relies upon a manual reconfiguration of hoses. I find and conclude that a structure requiring manual disconnection and reconnection in order to perform this function is not equivalent to a structure accomplishing the same function by way of valves without such manual intervention.
Further, the intended function of the structure disclosed in element five is not found in the DM 358. As noted previously, the transferring means disclosed by the Gambro '552 patent is intended to operate during dialysis. According to Mr. Hartranft, the transferring means on the DM 358 was designed to recalibrate the flow sensors before dialysis treatments.
Mr. Hartranft testified that it is possible to recalibrate the DM 358 during dialysis by using a hemostat to clamp shut the hose that directs spent dialysate out of the dialyzer and into the second flow sensor. Further, Dr. John Van Stone, a medical director familiar with the use of the DM 358 in clinical situations, testified that the sanitize/normalize interlock can be connected in place of the dialyzer during dialysis. However, this testimony merely illustrates the difference between the structure contained in the DM 358 and that disclosed by the Gambro '552 patent. While the DM 358's transferring means can be operated during dialysis, this operation requires using additional tools or requires the dialyzer to be physically disconnected from the system. The structure disclosed by the Gambro '552 patent can be operated during dialysis without modification other than adjusting valves. Thus I find and conclude that the DM 358 does not contain an equivalent structure identical in function to the transferring means disclosed by claim one of the Gambro '552 patent. Accordingly, I hold that the DM 358 does not embody element five of claim one.
Baxter also contends that the Repgreen UFM 1000 and the German '756 patent describe transferring means equivalent in structure and identical in function to those disclosed by the Gambro '552 patent. However, the only transferring means disclosed by these references is a "link" or hose that can be inserted between the first and second ducts in place of the dialyzer. Use of a substitute hose (instead of valves) to detour the clean dialysate around the dialyzer requires the same sort of manual intervention as the sanitize/normalize interlock system disclosed by the DM 358. Furthermore, in both the UFM 1000 and the German '756 patent, the substitute hose recalibration system clearly is intended for use before, not during, dialysis. Thus, I find and conclude that the UFM 1000 and the German '756 *1538 patent do not contain equivalent structures performing a function identical to that of the transferring means disclosed by the Gambro '552 patent. Accordingly, I conclude that neither the UFM 1000 nor the German '756 patent embodies element five of claim one.
The sixth element of Gambro's claim one provides that the "measured difference" when an equal flow of clean dialysate is directed through the first and second flow sensors is "adaptable as a reference." The Extracorporeal DM 358, the Repgreen UFM 1000, and the German '756 patent all teach methods of directing the same flow of clean dialysate through both the first and second flow sensors, so that the measured difference may be used as a reference. The DM 358 utilizes a microprocessor to record the measured difference and automatically compensate by that amount in subsequent flow measurements. The Repgreen UFM 1000 provides a means by which an operator could manually recalibrate the flow sensors to compensate for the measured difference in subsequent measurements. The German '756 patent teaches a procedure whereby a mark indicating the measured difference is placed upon a measuring scale as a reference for calculating subsequent flow measurements. Accordingly, I conclude that the DM 358, the UFM 1000 and the German '756 patent embody element six of the Gambro '532 patent.
Because neither the Extracorporeal DM 358, the Repgreen UFM 1000, nor the German '756 patent embodies each and every element of claim one of the Gambro '552 patent, I find and conclude that none of these references anticipated Gambro's claim.

2. Obviousness.
Section 103, 35 U.S.C., provides in pertinent part:
A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.
The standard for determining obviousness has been stated as follows:
In determining whether an invention would have been obvious at the time it was made, section 103 requires a court (1) to determine the scope and content of the prior art; (2) to ascertain the differences between the prior art and the claims at issue; and (3) to resolve the level of ordinary skill in the pertinent art. "Such secondary considerations as commercial success, long felt but unsolved needs, and failure of others to invent are also relevant to the obviousness inquiry."
Ryko Mfg. Co. v. Nu-Star, Inc., 950 F.2d 714, 716 (Fed.Cir.1991) (internal citations omitted); see also Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc., 807 F.2d 955, 958 (Fed.Cir.1986). A determination that an invention would have been obvious is a conclusion of law based on fact. In re Bond, 910 F.2d 831, 834 (Fed.Cir.1990).
Baxter contends that claim one of the Gambro '552 patent would have been obvious in light of: (1) the Extracorporeal DM 358; (2) the Repgreen UFM 1000 and manual; (3) the German '756 patent; (4) an article published by Gray and Sanderson in 1975; and (5) the general knowledge among those of ordinary skill in the art regarding the fact that flow sensors were frequently rendered inaccurate by accumulations of contaminants taken from the blood during dialysis.[3]
In determining the scope of the prior art and the differences between the prior art and claim one, I note that I already have found that the UFM 1000, the German '756, and the DM 358 do not embody element five of claim one. I have found that these references differ from the alleged Gambro invention in that they do not employ the equivalent *1539 of computer controlled valves designed to allow for recalibration of flow sensors during dialysis. Baxter argues, however, that employing valves for that purpose was obvious in light of these references, an article published by Gray and Sanderson in 1975, and the general knowledge among those of ordinary skill in the art regarding flow inaccuracies caused by the accumulation of contaminates during dialysis.
It is evident that during the time in question it was recognized that pretreatment recalibration of flow sensors was necessary to enhance flow sensor accuracy. As noted, the DM 358 and UFM 1000 ultrafiltration monitors, as well as the German '756 patent, taught a method of predialysis recalibration in which a hose could be installed temporarily to bypass the dialyzer and direct to each of the flow sensors an equal flow of clean dialysate.
It is also evident that the problem addressed by the Gambro '552 patent  contamination of the downstream flow sensor by ultrafiltrate removed from the blood during dialysis  was obvious to those skilled in the art at the time Gambro obtained the patent at issue. Prof. Sanderson, who testified for Gambro, admitted that he was aware of this problem prior to development of Gambro's alleged invention. Indeed, the problem of flow sensor contamination was discussed in his published 1975 article, a copy of which was found in the file of one of Gambro's named co-inventors. Likewise, Messrs. Eilers and Wittingham testified that they were aware of the problem of flow sensor contamination prior to Gambro's alleged invention. Moreover, a 1979 published report on the Repgreen UFM 1000 from the Royal Victoria Infirmary recognized flow sensor contamination as a cause of inaccuracy in that system.
Finally, those skilled in the art were clearly aware of the possibility of recalibrating a dialysis monitoring system during a dialysis treatment to compensate for flow sensor contamination. As noted above, both Dr. John Van Stone and Mr. Hartranft testified that they had observed recalibration of the DM 358 during the course of a dialysis treatment. Dr. Van Stone indicated that this procedure was frequently performed when conditions indicated that flow sensor contamination was causing the DM 358 to give inaccurate readings.
Gambro argues that even if recalibrating during dialysis was evident at the time of its alleged invention, the recalibration system disclosed by its '552 patent was not obvious because it utilizes computer controlled valves to shift to and from the recalibration mode. Gambro notes that other systems, such as the UFM 1000 and the DM 358, required manual disconnection and reconnection of hoses to perform recalibration during dialysis.
I have already found and concluded that the DM 358 and the UFM 1000 did not anticipate the Gambro '552 patent because they did not utilize computer controlled valves to recalibrate the flow sensors during the course of a dialysis treatment. However, I also find and conclude that the possibility of substituting a system of computer controlled valves for the system of hoses used by the DM 358 and the UFM 1000 was obvious to those skilled in the art during the time period in question. Dr. Eilers, Gambro's expert, testified that, despite the fact that the use of valves was not disclosed by figure three of the Gambro '552 patent, it was obvious that valves were contemplated because they provide the most efficient way to accomplish a fluid transfer. Thus, the use of valves would have been an obvious means to effect the fluid transfer necessary to recalibrate the DM 358 and the UFM 1000 during dialysis.
The testimony of Mr. Wittingham also supports a finding that it was obvious that valves could be used to shift a dialysis monitoring system to a recalibration mode during the course of a dialysis treatment. Mr. Wittingham testified that in 1979 he proposed to Gambro an ultrafiltration monitor that incorporated a system designed to compensate for inaccuracies caused by flow sensor contamination. This system used valves to direct an equal flow of clean dialysate through the first and second flow sensors. Further, this system was designed to operate during dialysis. Mr. Wittingham testified that he did not consider applying for a patent for this proposal because the idea of using valves to *1540 facilitate flow sensor recalibration would have been obvious to those skilled in the art.
This conclusion is also supported by the 1975 article published by Gray and Sanderson. That article detailed the development of an electromagnetic flow sensor with sufficient "baseline stability" to ensure accurate monitoring of dialysate flow during dialysis treatment. The article describes how a series of valves could be employed to direct an equal flow of dialysate through both the first and second flow sensors. According to the article's co-author, Prof. Sanderson, its purpose was to demonstrate the development of a flow sensor sufficiently resistant to baseline drift to insure accuracy without the need for recalibration. However, this article, published seven years before the date of the alleged invention, clearly suggests using a valve system to bypass or detour the clean dialysate around the dialyzer during the course of a dialysis treatment, a system remarkably similar to that adopted in Gambro's instant patent.
Finally, the testimony of Mr. Bengt-Ake Gummesson, who was named a co-inventor in Gambro's patent application, supports the conclusion that Gambro's alleged invention was obvious. Mr. Gummesson testified that once the problem of flow sensor contamination during dialysis was recognized, development of the solution  using valves to direct an equal flow of clean dialysate through both the first and second flow sensorswas "trivial." According to Mr. Gummesson, the Gambro inventors arrived at this solution within two weeks after diagnosing the problem of flow sensor contamination.[4]
Gambro argues that the nonobviousness of its claimed invention is demonstrated by the fact that it was the only system to address successfully the long felt need for increased flow sensor accuracy. However, as discussed below, at least one other inventor  Mr. Keith Wittingham  had developed the technology taught by Gambro's alleged invention prior to the Gambro '552 patent. Thus, I find and conclude that the Gambro invention was not the first successful attempt to solve a long felt need.
Clear and convincing evidence supports the proposition that the problem addressed by claim one of the Gambro '552 patent contamination of flow sensors during dialysis treatmentwould have been and was obvious to those of ordinary skill in the art, and I so find and conclude. Further, I find and conclude, based on clear and convincing evidence, that the solution to this problem disclosed by the Gambro '552 patentrecalibration of flow sensors during dialysis through use of a valve systemwas also obvious to those of ordinary skill in the art. Accordingly, I find and conclude that Baxter has shown by clear and convincing evidence that claim one of Gambro's '552 patent was obvious.

3. Derivation.
The derivation defense arises from 35 U.S.C. § 102(f), which provides: "A person shall be entitled to a patent unless  ... (f) he did not himself invent the subject matter sought to be patented."
The standard for derivation has been stated as:
To invalidate a patent for derivation of invention, a party must demonstrate that the named inventor in the patent acquired knowledge of the claimed invention from another, or at least so much of the claimed invention as would have made it obvious to one of ordinary skill in the art.
New England Braiding Co. v. A.W. Chesterton Co., 970 F.2d 878, 883 (Fed.Cir.1992). To prove derivation, the party attacking the patent must establish both prior conception of the subject matter and communication of the conception to the patentee. Price v. Symsek, 988 F.2d 1187, 1190 (Fed.Cir.1993). While the determination whether there was a prior conception is a question of law, the ultimate question of whether a patentee derived an invention is one of fact. Id.
Baxter contends that the Gambro '552 patent should be invalidated for derivation of invention because the alleged Gambro inventors acquired knowledge of the *1541 invention from Keith Wittingham. Mr. Wittingham worked at Repgreen as chief designer from 1972 until 1979. He testified that he was extensively involved in development of Repgreen's UFM 1000 ultrafiltration monitor. He also testified that in April 1979 he discussed with Gambro representatives the possibility of Repgreen's developing an ultrafiltration monitor for use with Gambro's dialysis machines. He testified that as a result of these discussions he proposed two potential ultrafiltration monitors for Gambro, both of which used systems of valves designed to bypass the dialysate flow around the dialyzer during dialysis so the flow meters could be recalibrated without substituting hoses into the system. At least one of these monitor systems included microprocessor control. In July 1979, he prepared a memorandum outlining his proposal. At trial he identified this memorandum as one later found in a notebook possessed by Gambro's alleged co-inventor, Mr. Gummesson, before Gambro's alleged invention.
I find as a fact that Mr. Wittingham provided the most credible testimony in the trial, especially in his account of how he developed his proposed ultrafiltration monitor. He exhibited a thorough understanding of the problems that led to development of his proposal, and his memory was the most complete of any of the witnesses. Moreover, Mr. Wittingham's proposal contained all the essential elements of the Gambro '552 patent. Accordingly, I find and conclude that Baxter has established by clear and convincing evidence that Mr. Wittingham had, and communicated to Gambro's alleged inventors, a prior conception of the subject matter disclosed by claim one no later than July 1979. Thus I find and conclude that Baxter has demonstrated "that the named inventor(s) in the patent acquired knowledge of the claimed invention from another, or at least so much of the claimed invention as would have made it obvious to one of ordinary skill in the art." New England Braiding Co., 970 F.2d at 883.
Indeed, the evidence clearly establishes that Mr. Wittingham was the actual inventor of the system Gambro patented by claiming that four of its employees had co-invented it. Mr. Wittingham's memorandum was the only document disclosed at trial that describes development of the Gambro invention. Gambro introduced no other evidence documenting its alleged development of the invention, and only the most skimpy oral evidence was forthcoming. Gambro did offer the testimony of its alleged co-inventors. However, all those it named as co-inventors had conveniently forgotten the events leading to the Gambro '552 patent, including how the invention was developed. Indeed, none of the Gambro co-inventors could recall which of them came up with the critical component idea of bypassing the dialyzer to flow clean dialysate through both the first and second flow sensors in order to recalibrate during dialysis. All the circumstantial evidence points to the fact it was not necessary for any of them to do so, for that idea  the essence of the invention  had been presented to them on a silver platter by both Professor Sanderson and Mr. Whittingham.
Moreover, the alleged Gambro co-inventors admittedly had little or no prior experience in the field of dialysis. Gambro's contention that these inexperienced inventors proposed and conceived the invention within two weeks is simply not credible. A more believable explanation of the development of Gambro's alleged invention is that Gambro derived it from information communicated by Mr. Wittingham with an assist from the Sanderson article. I find that the overwhelming evidence, both circumstantial and direct, points to that fact. I further find as a fact that the testimony of Gambro's employees on this aspect of the case is incredible.
Further I find and conclude that Mr. Wittingham communicated his conception to Gambro. Mr. Wittingham testified that he met with Gambro twice during 1979 to discuss his proposal. The memorandum prepared by Mr. Wittingham at or about the time of these meetings and later found in Mr. Gummesson's possession, describes a valve actuated system that could automatically bypass the dialyzer to allow for recalibration of the flow sensors. Obviously this could be accomplished during a dialysis treatment.
Gambro objects that Mr. Wittingham's memorandum does not communicate the conception of a complete, operative device. *1542 Gambro notes that the memorandum does not describe how the control signal initiating the flow sensor recalibration procedure would be generated or how the flow sensors would be recalibrated, and does not set out other details necessary to build an operating ultrafiltration monitor. Gambro further argues that the memorandum does not state specifically that recalibration would be accomplished during dialysis. Finally, Gambro argues that the memorandum does not detail a system that utilizes microprocessor control of the valves.
Admittedly, Mr. Wittingham's memorandum is somewhat incomplete; he freely stated that it is simply a sketch rather than a detailed engineering diagram of his proposal. He further testified that he had never built an operating prototype.
However, in order to show derivation of an invention, it need not be shown that the invention conceived had been built, or even that a complete conception of the invention had been communicated. Rather, it must be shown that at least so much of the claimed invention had been communicated as would have made the invention obvious to one of ordinary skill in the art. See New England Braiding Co., 970 F.2d at 883. Mr. Wittingham's memorandum refers to recalibration of the flow sensors by means of valves and a bypass system. His memorandum also mentions using a computer to control the functions detailed in his proposal.[5] Thus, I find and conclude that the memorandum communicates information sufficient to render the Gambro invention obvious.
Gambro also objects that there is no evidence that it actually used Mr. Wittingham's memorandum to create the Gambro invention. I disagree. The Wittingham memorandum was found in Mr. Gummesson's notebook. It is inconceivable that this document was not reviewed or referred to in the course of Gambro's attempts to solve the problem of flow sensor contamination.
Lastly, Gambro objects that, even if it derived its invention from Mr. Wittingham, the Gambro '552 patent should not be invalidated because Gambro obtained the rights to his proposal when it purchased certain of Repgreen's assets following Repgreen's liquidation. Gambro argues that the Gambro '552 patent is therefore valid, despite the fact that the patent was issued in the alleged co-inventors' names, rather than Mr. Wittingham's.
In determining whether Gambro obtained the rights to Mr. Wittingham's proposal, the court must first inquire: (1) whether Mr. Wittingham's proposal was in fact owned by Repgreen; and (2) if so, whether Gambro purchased the rights to Mr. Wittingham's proposal when it purchased certain of Repgreen's assets.
Mr. Wittingham was a British citizen when he developed his proposal. Further, he was employed by Repgreen, a British company. Thus, I look to British law to determine whether Repgreen owned Mr. Wittingham's proposal.
Section 39(1) of the Patents Act, 1977, provides:
(1) Notwithstanding anything in any rule of law, an invention made by an employee shall, as between him and his employer, be taken to belong to his employer for the purposes of this Act and all other purposes if
(a) it was made in the course of the normal duties of the employee or in the course of duties falling outside his normal duties, but specifically assigned to him, and the circumstances in either case were such that an invention might reasonably be expected to result from the carrying out of his duties; or
(b) the invention was made in the course of the duties of the employee and, at the time of making the invention, because of the nature of his duties and the particular responsibilities arising from the nature of his duties he had a special obligation to further the interests of the employer's undertaking.
*1543 Mr. Wittingham was employed as Repgreen's chief engineer. His duties included design and consulting services, including development of proposals for clients. He testified that he considered the development of his proposal for Gambro something that he would normally undertake in the course of those duties. Thus, I find and conclude that his proposal was made in the course of his normal duties, and was owned by Repgreen prior to its liquidation.
In considering whether Repgreen assigned to Gambro the rights to patent Mr. Wittingham's proposal, I must first determine whether under British law a party may assign the right to patent an idea.[6] Section 7(2) of the Patent Act Provides that a patent for an invention may be granted to "any person ... who by virtue of an enforceable term of any agreement entered into with the inventor before the making of the invention, was ... at the time of the making of the invention entitled to the whole of the property in it." This passage indicates that an unpatented invention is indeed "property," and that rights to such property may be transferred. Accordingly, I conclude that under British law one may assign the rights to an unpatented invention.
I next consider whether Gambro purchased the right to Mr. Wittingham's unpatented proposal when it purchased certain of Repgreen's assets. The July 12, 1979 assignment from Repgreen to Gambro (Assignment) assigned to Gambro the rights to an invention entitled "Compensation for Fluid Channel Dimension Variation in a Flow Meter." That invention taught a means to calibrate electromagnetic flow sensors during their manufacture. The Assignment also assigns to Gambro "the rights to certain technical information and secret know-how relating to the Invention and the subject matter of the Drawings and the use and exploitation of the same." (Exh. 336, ¶ E). Mr. Wittingham's proposal clearly was technical information relating to the use of the electromagnetic flow sensors described in the invention. Accordingly, I find and conclude that the subject matter of Mr. Wittingham's proposal was owned by Repgreen and assigned to Gambro.
Lastly, I must consider whether the Gambro '552 patent issued by naming alleged co-inventors who were not really inventors is nonetheless valid because Gambro owned the subject matter of Mr. Wittingham's proposal. Gambro asserts that, pursuant to 35 U.S.C. § 256, it may amend the Gambro '552 patent to include Mr. Wittingham as a co-inventor.
Section 35, U.S.C. § 256, provides in pertinent part:
Whenever a patent is issued and it appears that a person was a joint inventor, but was omitted by error and without deceptive intention on his part, the Commissioner may, on application of all the parties and assignees, with proof of the facts and such other requirements as may by imposed, issue a certificate adding his name to the patent as a joint inventor.
The misjoinder or nonjoinder of joint inventors shall not invalidate a patent, if such error can be corrected as provided in this section.
By its plain language, this section is limited to the correction of errors involving joint inventorship. It does not permit substitution of one inventor for another under guise of a "correction." Rival Mfg. Co. v. Dazey Prods. Co., 358 F.Supp. 91, 101 (W.D.Mo.1973). Further, it is a violation of 35 U.S.C. § 102(f) for an employer to claim sole inventorship of a device actually invented by an unacknowledged employee. Mayview Corp. v. Rodstein, 620 F.2d 1347, 1351 (9th Cir.1980).
Gambro now belatedly claims that Mr. Wittingham's name was inadvertently omitted from the Gambro '552 patent application as a joint inventor. However, the evidence demonstrates that Mr. Wittingham was the sole, not joint, inventor of the Gambro invention. Mr. Wittingham offered clear, convincing and highly credible testimony that he conceived all the essential elements of the Gambro invention, including the idea of using valves to bypass the dialyzer thus allowing *1544 for recalibration of the flow sensors during dialysis. He was a neutral witness with no relationship to either party and no pecuniary interest in the outcome of this lawsuit. As stated, the individuals named in the Gambro '552 patent as co-inventors could not recall any details regarding their alleged individual contributions, nor did they offer any testimony showing that they had added anything new to Mr. Wittingham's proposal. Thus, I find and conclude that Mr. Wittingham was the sole, not joint, inventor of the invention disclosed by claim one of the Gambro '552 patent, and that the Gambro '552 patent may not now be corrected by adding Mr. Wittingham's name to the patent as a joint inventor, or by substituting his name as the sole inventor.
Gambro also has failed to establish that the omission of Mr. Wittingham as a named inventor of the Gambro '552 patent was without deceptive intent. The evidence demonstrates that Mr. Wittingham was in fact the sole inventor, and that the alleged Gambro co-inventors added nothing to his proposal. Thus, there should have been no doubt or confusion as to the identity of the actual inventor. Moreover, the evidence demonstrates clearly and conclusively that Mr. Wittingham's origination of the invention simply was concealed by Gambro. Thus, I conclude that Gambro violated 35 U.S.C. § 102(f) by deceptively naming the alleged co-inventors, rather than Mr. Wittingham, as the inventors.
In summary, I find and conclude that Baxter has shown by clear and convincing evidence that Mr. Wittingham had a clear conception of the subject matter of claim one of the Gambro '552 patent, and that Mr. Wittingham communicated this conception to Gambro. Gambro's alleged co-inventors clearly derived the invention disclosed by claim one of the Gambro '552 patent from Mr. Wittingham. I further conclude that, because Mr. Wittingham was the sole inventor, Gambro may not now correct the Gambro '552 patent application by naming Mr. Wittingham as a joint inventor. Accordingly, I find and conclude that the Gambro '552 patent should be invalidated for derivation.

4. Indefiniteness.
Section 112, 35 U.S.C., provides in pertinent part:
The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same....
The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.
Baxter contends that Gambro's specification does not meet the requirements of this section with respect to claim one because Gambro does not set forth in the specification an adequate description of the transferring means. Baxter further contends that any transferring means that is described does not contain the limitations of "valves," "computer," or "during dialysis," and argues that if the transferring means is understood as containing these limitations, claim one is indefinite.
The standard for determining whether a means-plus-function description is adequate under § 112 has been stated as follows:
Although the applicant does not have to describe exactly the subject matter claimed, the description must clearly allow persons of ordinary skill in the art to recognize that he or she invented what is claimed.... The test for sufficiency of support in a patent application is whether the disclosure of the application relied upon "reasonably conveys to the artisan that the inventor had possession at that time of the later claimed subject matter."
In re Hayes Microcomputer Prods., Inc., 982 F.2d 1527, 1533 (Fed.Cir.1992). I have already concluded that the specification of the Gambro '552 patent discloses to a person of ordinary skill in the art a transferring means that relies upon computer controlled valves to transfer the flow of dialysate in accordance with the flow path described by figure three. I have further concluded that this means must be designed to operate during *1545 dialysis. Thus, claim one "reasonably conveys to the artisan" that Gambro had possession of the subject matter at issue at the time it submitted its application for the Gambro '552 patent. Accordingly, I conclude that claim one is not invalid for indefiniteness.

5. Inequitable Conduct.
Baxter asserts that Gambro's inequitable conduct before the patent office should preclude any judgment in its favor. Either failing to disclose material information or submitting false material information, with intent to deceive, may amount to inequitable conduct. Kingsdown Medical Consultants, Ltd. v. Hollister, Inc., 863 F.2d 867, 876 (Fed.Cir.1988), cert. denied, 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989). Whether or not there has been inequitable conduct is an issue committed to the trial court's discretion. Id. at 872. Both materiality and intent must be proven by clear and convincing evidence. Id. A finding of an intent to deceive may follow from an assessment of materiality, knowledge, and surrounding circumstances, including consideration of any evidence of good faith. Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co., 973 F.2d 911, 918 (Fed.Cir.1992). Identity of a device's true inventor is a material fact essential to issuance of a patent; deceptive intention may be inferred from concealment of the true inventor's identity. Rival Mfg. Co., 358 F.Supp. at 102.
Where a court has determined that inequitable conduct has occurred, all of the claims of a patent  not merely the particular claims to which the inequitable conduct is directly connected  are unenforceable. J.P. Stevens & Co., Inc. v. Lex Tex Ltd., 747 F.2d 1553, 1561 (Fed.Cir.1984), cert denied, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985).
Baxter first argues that Gambro committed inequitable conduct by making false statements to the patent examiner regarding the teachings of the German '756 patent.[7] Baxter contends that Gambro led the patent examiner to erroneously conclude that the German patent does not teach a method of directing a stream of clean dialysate through both the first and second flow sensors, when in fact that patent discloses that a hose may be used for that purpose. In support of its argument, Baxter refers to the first amendment to Gambro's patent application, in which Gambro stated:
In the same way, the measuring cell 9 [of the German '756 patent] is at all times influenced only by the contaminated dialysis solution.... At no time does the German patent transfer the clean dialysis solution, i.e., the first fluid, through the second measuring cell 9, while preventing the flow of the contaminated dialysis solution, i.e. the second solution, from flowing therethrough....
As noted, the German patent is totally void of providing a dialyzer where the clean dialysis solution is permitted to flow through both the first and second ducts of the measuring cell.
(Exh. C-22, at 5-6.) Baxter also refers to a section of the German '756 patent, which states:
In this way it is possible to compensate for the inaccuracy in the measurement caused by manufacturing deviations of the flowmeters by shifting the flowmeters when there is a constant flow such as that established when a hose connection is inserted into the dialysate circuit instead of the dialyzer. The position at which the measurement error caused by manufacturing deviations has been compensated can easily be indicated by means of a mark and thus can be eliminated from the differential flow measurement.
After reviewing Gambro's communications to the patent examiner, as well as the language of the German '756 patent itself, I agree that Gambro misrepresented to the patent examiner the teachings of the German patent. Gambro informed the patent examiner that the German patent does not teach a method for transferring clean dialysis solution to the second flow sensor "while preventing the flow of the contaminated solution" to that flow sensor. (Exh. C-22, at 5). However, the German '756 patent clearly discloses *1546 a means by which a hose can be inserted in place of the dialyzer in order to direct clean dialysate through both the first and the second flow sensors. As stated the German '756 patent thus describes a method for transferring the same stream of clean dialysate through both the first and second flow sensors. Further, because the hose directs only clean dialysate through the second flow sensor, the German '756 patent discloses a means for preventing the flow of contaminated dialysis solution through the second flow sensor. Thus, Gambro's statement to the patent examiner that the German '756 patent does not disclose a means to "transfer the clean dialysis solution ... through the second measuring cell 9, while preventing the flow of the contaminated dialysis solution ... from flowing therethrough," misrepresented the German '756 patent's teachings.
This misrepresentation is especially egregious because it occurred in an amendment submitted after the patent examiner had rejected Gambro's claim on the basis of the German patent. Moreover, although the patent examiner did not read or write German, Gambro's in-house patent attorney, Mr. Boberg, did. It stretches credulity beyond the breaking point to infer from all the circumstances in evidence that Mr. Boberg did not know of this misrepresentation and of its critical significance.
Gambro argues that its statements did not misrepresent the German '756 patent because the German '756 patent merely describes a system whereby the flow sensors may be calibrated at the factory. The German '756 patent notes that use of a hose in place of the dialyzer circuit allows for correction of manufacturing deviations. However, in stating that the hose can be substituted in place of the dialyzer circuit, the German '756 patent suggests that this substitution could occur in clinical practice anywhere. Certainly the evidence does not demonstrate that performance of this simple maneuver necessarily is limited to the factory.
Gambro next argues that its statements to the patent examiner did not misrepresent the German patent because they merely pointed out that the German patent does not teach recalibration of the flow sensors during dialysis. However, Gambro's patent application statements do not support this argument. Gambro's statements represent that the German patent "at no time" teaches recalibration of the flow sensors by directing an equal flow of clean dialysate through the first and second flow sensors. As noted, that statement simply is false. Unfortunately its falsity was shrouded in the intricacies of German language.
Finally, Gambro argues that even if its statements to the patent examiner misrepresented the teachings of the German '756 patent, there is no evidence of an intent to deceive. However, as noted above, an intent to deceive may be inferred from the defendant's overall conduct and from circumstantial evidence. Here Gambro clearly misrepresented the teachings of the German '756 patent. Further, this misrepresentation occurred at a critical moment after the Gambro application had been rejected on the basis of that German patent. These circumstances alone, especially when considered with the fact that Gambro's in-house patent counsel, Mr. Boberg, understood German, are more than sufficient to support an inference of intent to deceive.
Moreover, I find and conclude that Gambro's failure to name Mr. Wittingham as the inventor, or even as a co-inventor, in the Gambro '552 patent application constitutes corroborating evidence of an intent to deceive.
The United States Supreme Court, in describing the equities implicated in the issuance of a patent, stated:
A patent by its very nature is affected with a public interest. As recognized by the Constitution, it is a special privilege designed to serve the public purpose of promoting the "Progress of science and the useful arts." At the same time, a patent is an exception to the general rule against monopolies and to the right to access to a free and open market. The far reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such *1547 monopolies are kept within their legitimate scope.
Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co., 324 U.S. 806, 816, 65 S.Ct. 993, 998, 89 L.Ed. 1381 (1945). These words evidence a deep concern that the issuance of a patent truly promote the progress of science and justify the extraordinary and exclusive privileges created by its issuance.
Gambro asks this court to enforce and thus validate a patent for an invention derived from the unrecognized work of a third party, and for an idea deemed by others, including the true inventor, as obvious to anyone skilled in the art. Moreover, the patent application for this idea was initially rejected as obvious and anticipated. It ultimately was approved only because Gambro misrepresented the teachings of prior art. In such circumstances, I find and conclude that Baxter has established by clear and convincing evidence that validation of the Gambro '552 patent would be inconsistent with the policies underlying the patent system, and with fundamental justice.
Accordingly, I conclude that the Gambro '552 patent is unenforceable because of Gambro's inequitable conduct.

6. Failure to Disclose Best Mode.
The first paragraph of 35 U.S.C. § 112 provides:
The specification shall contain a written description of the invention and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention. (emphasis added).
A proper best mode analysis has two components. First, the court must inquire whether, at the time the inventor filed his patent application, he knew of a mode of practicing his claimed invention that he considered to be better than any other. Chemcast Corp. v. Arco Indus. Corp., 913 F.2d 923, 927-28 (Fed.Cir.1990). This part of the inquiry is wholly subjective. Id. at 928. Second, if the court concludes that the inventor contemplated such a mode, the court must compare what the inventor knew with what is disclosed by the patent. Id. Compliance with the best mode requirement is a question of fact. Id.
Baxter contends that Gambro failed to comply with the best mode requirement because Gambro knew at the time of its patent application that a molded plastic construction was preferable for the flow sensors. In addition, Baxter contends that Gambro knew that the use of three-way valves was preferred. However, Baxter has provided no evidence that Gambro had such knowledge. Indeed, the testimony uniformly supports the proposition that neither molded plastic construction for the flow sensors nor three-way valves were considered inherently preferable modes of practicing the Gambro '552 patent's subject matter. Accordingly, I find that Baxter has failed to provide clear and convincing evidence that Gambro failed to comply with the best mode requirement.

C. Willful Infringement.

Gambro contends that Baxter's infringement after August 1990, the date it asserts that it notified Baxter regarding Baxter's infringement, has been deliberate and willful.
An infringer who has received actual notice of a patentee's rights has an affirmative duty of due care. Ortho Pharmaceutical Corp. v. Smith, 959 F.2d 936, 944 (Fed.Cir. 1992). This normally includes the duty to seek and obtain competent legal advice regarding the potential infringement. Ryco Inc. v. Ag-Bag Corp., 857 F.2d 1418, 1428 (Fed.Cir.1988). However, an opinion from counsel need not necessarily be correct in order for the infringer to avoid a finding of willfulness. Ortho Pharmaceutical, 959 F.2d at 936. Rather, the infringer's intent and reasonable beliefs are the primary focus of the willful infringement inquiry. Id.
The question of willful infringement is one of fact. Ryco, 857 F.2d at 1428. The patentee has the burden of proving willful infringement by clear and convincing evidence. E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co., 849 F.2d 1430, 1440 *1548 (Fed.Cir.), cert. denied, 488 U.S. 986, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988).
Gambro contends that Baxter knew of the Gambro '552 patent at least as early as August 1990, when Gambro gave Baxter actual notice. Gambro argues that Baxter's failure to obtain legal advice regarding infringement prior to August 1992, demonstrates willful intent. However, although Gambro notified Baxter of the Gambro '552 patent's existence in August 1990, Gambro did not specifically charge Baxter with infringement until March 1992. In 1991, after Baxter was originally notified of the patent's existence, Baxter initiated a prior art search on the basis of which it concluded that the Gambro '552 patent was invalid. In August 1992, a few months after being charged by Gambro with infringement, Baxter obtained a legal opinion that concluded that the Gambro '552 patent was anticipated by the Extracorporeal DM 358. Thus, I find that Baxter obtained an opinion from counsel within a reasonable time after it was charged with infringement, and relied in good faith on that opinion.
Gambro also argues that Baxter's counsel's opinion is conclusory and incomplete. I disagree. Although I have concluded that the Gambro '552 patent was not anticipated by the DM 358, I do not find Baxter's attorney's opinion concluding otherwise to be conclusory, incomplete, or otherwise to justify a finding of willfulness. The opinion carefully considers the Gambro '552 patent in light of the prior art and reaches a reasonable conclusion regarding the patent's invalidity.
Accordingly, I find that Baxter's actions do not demonstrate an intent willfully to infringe the Gambro '552 patent.

D. Contributory and Induced Infringement.

Gambro contends that, if direct infringement has occurred, Baxter is also liable pursuant to 35 U.S.C. § 271(c) for contributory infringement and pursuant to 35 U.S.C. § 271(b) for inducing infringement by others. However, Gambro has introduced no evidence in support of these contentions. Thus, I find and conclude that Gambro has not shown that Baxter is liable for contributory or induced infringement.

E. Attorneys' Fees.

Both Baxter and Gambro have requested an award of attorneys' fees. Pursuant to 35 U.S.C. § 285, the court in exceptional cases has discretion to award reasonable attorneys' fees to the prevailing party. Acoustical Design, Inc. v. Control Electronics Co., 932 F.2d 939, 942 (Fed.Cir.), cert. denied, 502 U.S. 863, 112 S.Ct. 185, 116 L.Ed.2d 146 (1991). To prevail under this provision, a party must show the exceptional character of the case by clear and convincing evidence. Cambridge Products, Ltd. v. Penn Nutrients, Inc., 962 F.2d 1048, 1050-51 (Fed. Cir.1992). I find and conclude that neither party has shown that this case is so exceptional that it is entitled to an award of attorneys' fees.
Accordingly, IT IS ORDERED that
(1) Judgment is entered for Baxter and against Gambro on Baxter's claim that claim one of the Gambro '552 patent is invalid as obvious;
(2) Judgment is entered for Baxter and against Gambro on Baxter's claim that claim one of the Gambro '552 patent is invalid for derivation;
(3) Judgment is entered for Baxter and against Gambro on Baxter's claim that the Gambro '552 patent is invalid for inequitable conduct;
(4) Judgment is entered for Baxter and against Gambro on Gambro's claims of infringement and willful infringement;
(5) Judgment is entered for Baxter and against Gambro on Gambro's claim of contributory infringement;
(6) Judgment is entered for Baxter and against Gambro on Gambro's claim of inducing infringement by others;
(7) Claim one of Gambro's Patent No. 4,585,552 is adjudged and decreed to be invalid;
(8) Gambro's Patent No. 4,585,552 was obtained by inequitable conduct and therefore that patent is unenforceable;
(9) Neither party shall recover attorneys' fees from the other; and

*1549 (10) Each party shall pay its own costs.
NOTES
[1] Hemodialysis will hereafter be referred to simply as "dialysis."
[2] The DM 358, however, uses only one flowmeter per duct. The SPS 550 uses two flow sensors per duct.
[3] Baxter also contends that the Gambro '552 patent was obvious in light of the Blair '107 patent. Gambro contends that the Blair '107 patent is nonanalogous art. Because I find and conclude that the Gambro '552 patent was obvious in light of the other prior art references, I need not consider this issue.
[4] I note that Mr. Gummesson originally testified that the problem of flow sensor contamination was not recognized until 1982. However, his testimony was later contradicted by other Gambro witnesses, who indicated that this problem was recognized as early as 1975.
[5] The sufficiency of the Wittingham proposal is especially evident when viewed in light of the Gambro '552 patent itself, which does not detail the specific means by which the fluid transfer described by element five will be accomplished.
[6] Section 30(2) of the Patents Act specifically provides that a patent application may be assigned, but does not mention whether a party may assign the rights to an invention not yet the subject of an application.
[7] It is undisputed that the German '756 patent, which was the basis for the patent examiners original rejection of the Gambro '552 patent, is a highly material prior art reference.