**RIVAL MANUFACTURING COMPANY, Plaintiff,**

**v.**

**DAZEY PRODUCTS COMPANY, Defendant.**

**Civ. A. No. 18440–3.**

United States District Court,
W. D. Missouri, W. D.

Feb. 14, 1973.

Carter H. Kokjer, Claude W. Lowe, William B. Kircher, Scofield, Kokjer, Scofield & Lowe, Kansas City, Mo., for plaintiff.

Donald E. Johnson, Robert D. Hovey, Schmidt, Johnson, Hovey & Williams, Kansas City, Mo., for defendant.

FINAL JUDGMENT ON COUNT I AND ORDER DENYING PLAINTIFF'S APPLICATION FOR ORDER TO COMMISSIONER UNDER 35 U.S. CODE 256

WILLIAM H. BECKER, Chief Judge.

This is an action in two counts for alleged infringement of a patent No. 3,423,825 issued to Frost and Maguire, for trademark infringement and unfair competition. The action is now before the Court for a ruling upon an Application (motion) for Order under Section 256, Title 35, filed by plaintiff. In the application plaintiff asserts the existence of a defect in the patent-in-suit, arising from failure to name all of the alleged joint inventors in the patent as issued. Plaintiff moves for an order of this Court directing the Commissioner of Patents now to issue a certificate adding two additional persons to the patent as being joint inventors with the two patentees originally named therein.

A Notice of Hearing and Order to Show Cause in support or opposition to the Application was entered and sent to the two original patentees, the corporate assignee of the original patentees through which plaintiff claims title to the patent under a subsequent assignment, the two alleged additional joint inventors, and the employer of the latter at the time of the acts of alleged joint invention in question, and also to plaintiff and defendant in this action. Pursuant to such notice and order, affidavits of the original patentees and the alleged additional joint inventors were filed. An affidavit of plaintiff's attorney and a Memorandum of Authorities were filed by plaintiff, an affidavit of defendant's attorney and an Opposition containing memoranda of facts and authorities were filed by defendant, and a hearing was held. During the hearing, at which the only appearances were by plaintiff and defendant, the affidavits and extensive evidence, including the deposition testimony of the original patentees, the alleged additional joint inventors, the patent attorney who handled the application for and securing of the patent, certain officers and employees of the assignee of the original patentees, and certain officers of plaintiff, and various related physical and documentary exhibits, were admitted for consideration in connection with the Application. Oral arguments of counsel for plaintiff and defendant, respectively supporting and opposing the Application, were heard.

Upon such hearing, and after due consideration of the affidavits, evidence, arguments and authorities presented, the Court enters the following findings of fact and conclusions of law:

FINDINGS OF FACT

1. Plaintiff Rival Manufacturing Company and defendant Dazey Products Company are both Missouri corporations having their principal places of business in Kansas City, Missouri, and are competitors in the manufacture and sale of can openers and other household appliances.

2. The patent involved in this action is U. S. Patent No. 3,423,825, entitled "Can Opener," which was issued on January 28, 1969, to Richard H. Frost and John Maguire as joint inventors and patentees, from an application filed January 30, 1967, in the names of Frost and Maguire as joint inventors.

3. Only Claim 2 of the patent is charged by plaintiff to have been infringed by defendant. Therefore Claim 2 is the only claim of the patent directly involved in the controversy before the Court in this action. Claim 2 reads as

follows (the bracketed letters being inserted for convenience of later reference):

"2. A can opener having means for supporting:

[a] a drive roller mounted for rotation about a generally horizontal axis and adapted to engage the underside of the rim of a can placed against said drive roller;

[b] means for rotating said drive roller;

[c] an arm mounted for movement between a first position adjacent said drive roller and a second position above said drive roller;

[d] knife means mounted on said arm for piercing the top of said can and for severing said can top as said can is rotated by said drive roller;

[e] means for connecting said arm to said support means for said movement between said first position adjacent said drive roller and said second position above said drive roller and for additional movement in a direction away from said first position to a third position spaced from said second position; and

[f] means carried by said support means for cooperation with said connecting means for maintaining said arm adjacent said support means during such movement between said first, second and third positions but permitting said arm to be removed from said support means and to be replaced in said support means solely by manual movement of said arm when in said third position."

4. Assuming for purposes of the Application now before the Court, but not deciding, that the subject matter of Claim 2 is entitled to the protection of a patent, the feature essential to existence of novelty or invention in the combination of elements claimed is clearly confined to the concept of providing for convenient removability of the knife-carrying arm to facilitate cleaning thereof, which is found in clause [f] of the claim, i. e. "means . . . permitting said arm to be removed from said support means and to be replaced in said support means solely by manual movement of said arm when in said third position". The remainder of the claimed combination found in clauses [a] through [e] of Claim 2 are conventional, as expressly confirmed by the testimony of patentee Frost and plaintiff's Vice President of Engineering Scott and tacitly further confirmed by the presence of the elements and relationships of clauses [a] through [e] of the claim in an earlier model can opener of defendant having a non-removable arm, before the Court as Defendant's Exhibit 9, which plaintiff does not charge to infringe.

5. Claims 3 through 6 are also directed to combinations of elements including the removable arm feature, but define such feature more narrowly and with more detailed reference to the particular structure disclosed for such purpose in the patent, namely, the use of a pivotal mounting shaft on the arm having a key-like lateral projection near the end of the shaft remote from the arm, in conjunction with a key-hole shaped opening in the body shell of the can opener for receiving and normally holding the shaft but adapted to permit removal of the shaft from the opening whenever the arm is swung to a position aligning the key-like lateral projection on the shaft with the lateral slot portion of the key-hole shaped opening.

6. Claims 1 and 7 of the patent make no reference at all to the removable arm feature. These claims are directed to combinations of elements characterized by inclusion therein of a guide structure feature including a guide plate and guide roller.

7. The can opener development upon which the patent is based was initiated by Samsonite Corporation ("Samsonite" hereinafter), formerly called Schwayder Bros., Incorporated, a Denver based company, best known for the luggage it

sells under the name "Samsonite." During 1965, Samsonite became dissatisfied with can openers it had been obtaining from a third-party appliance manufacturer for resale, and decided to develop its own can opener. In November of 1965, Samsonite assigned to its wholly-owned subsidiary, Design West, Incorporated ("Design West" hereinafter), located in Irvine, California, the project of designing the aesthetic and general functional attributes of an electric can opener that Samsonite could manufacture for itself. In turn the project was assigned by Design West to Milton J. Halsted, then employed by Design West.

8. In January of 1966, Samsonite retained Frost Engineering Development Corporation ("Frost Engineering" hereinafter), an independent engineering organization located in Englewood, Colorado. The patentee Frost was President of Frost Engineering and patentee Maguire was its Manager of Commercial Projects. Frost Engineering undertook a project to study and find ways to correct the deficiencies of the can openers Samsonite had been obtaining from a third-party manufacturer. This project was carried forward by study and testing of the can openers Samsonite had been purchasing for resale and other competitive can openers then on the market.

9. During January or early February of 1966, Design West employee Halsted conceived at Design West and discussed with Mr. Fujioka, its president, the idea and desirability of making the cutter-carrying arm of the proposed can openers removable without the use of tools, but Halsted did not know how to accomplish such result.

10. At some time prior to February 8, 1966, Halsted went over to the neighboring desk of his fellow employee Tim M. Uyeda at Design West and asked the latter's help on the problem of mechanical design of a mounting of a cutter-carrying arm on a can opener, removable without tools. During this conference at Design West, lasting no more than an hour, Uyeda proposed to Halsted the use of a shaft on an arm having a key-like lateral projection in conjunction with a key-hole shaped opening in the can opener body as a suitable mechanical means of making a mounted cutter-carrying arm on a can opener, removable without tools.

11. On February 8, 1966, at Design West, Halsted made and shortly thereafter sent to Samsonite a drawing of Design West's can opener design, which is before the Court as Deposition Exhibit 8 to Plaintiff's Exhibit 8. This drawing included disclosure of a cutter-carrying arm, as proposed by Halsted, mounted on the body of the can opener by means of a shaft and key-hole structure, and removable without tools as proposed by Uyeda.

12. Design West then made and sent to Samsonite a model of Design West's can opener design, which is before the Court as Plaintiff's Exhibit 13, and which (although it did not include a motor or other internal parts so as to be a fully operable can opener) did include a cutter-carrying arm mounted on the can opener body by means of a shaft on the arm provided with a lateral key projection adapted to be received and removed, without tools, within a key-hole shaped opening in the can opener body. The model was adequate to demonstrate at least the feasibility of a removably mounted cutter-carrying arm by those means.

13. During mid or late February of 1966, the nature of Frost Engineering's project was changed by Samsonite from a project to rectify the deficiencies of the can openers theretofore purchased for resale by Samsonite to a project (a) for supplying engineering services to complete the engineering aspects of Design West's can opener design and (b) for making the new can opener ready for production by furnishing parts, drawings, materials specifications and other details. At that time, a copy of Halsted's drawing, Deposition Exhibit 8 to Plaintiff's Exhibit 8, was supplied to Frost Engineering in the nature of an instruction from Samsonite concerning

features to be incorporated in the final production design. Patentee Maguire immediately understood from the Halsted drawing that the final design was to include a removable cutter-carrying arm mounted on the body of the can opener by a shaft having a key-like lateral projection receivable and releasable within a key-hole shaped opening in the body, without tools.

14. If either the concept of a removable cutter-carrying arm of a can opener mounted in the manner described by Claim 2 of the patent or the use of a key-like shaft and key-hole opening for accomplishing that concept are inventions, it is clear that they were conceived by employees of Design West in California, prior to and independently of any invention by patentees Frost and Maguire at Frost Engineering in Colorado. During the taking of their depositions on discovery by defendant, both Frost and Maguire confirmed that they had not originally conceived or invented either the removable arm feature as broadly defined in Claim 2 or the idea disclosed in the patent of using a key-like shaft on the arm with a key-hole shaped opening in the can opener body to accomplish that result.

15. Frost Engineering completed its engineering work on Design West's basic can opener design, including the choice or engineering of various internal portions of the device, and delivered a set of detailed drawings intended for use in production to Samsonite on April 18, 1966, some of which were then supplemented or further refined by Samsonite's own engineering department in Denver.

16. Apart from routine engineering details of the final Samsonite can opener design, Frost Engineering's contribution to that design related primarily to the independent development by Frost and Maguire (or one of them) of the guide structure feature referred to in Claims 1 and 7 of the patent. There is no contention that Halsted or Uyeda made any contribution to Claims 1 and 7. During the course of the project and in April of 1966, however, Frost Engineering also developed and disclosed to Samsonite certain ideas for a so-called "automatic feature" for can openers, the details of which are not in the record before the Court because, as of the time of discovery in this action, no patent application had yet been filed on this automatic feature that was regarded as being a proprietary trade secret by the witnesses and Samsonite. But it has been stipulated by counsel for the parties to this action that this automatic feature is neither disclosed nor claimed in the patent now in question in this action.

17. The removable cutter-carrying arm feature originated at Design West and referred to in Claims 2 through 6 of the patent is not functionally related to or interdependent with the guide structure feature originated at Frost Engineering and referred to in Claims 1 and 7, in the sense that, although both are included in the over-all design of the can opener disclosed in the patent, neither requires the other and either can be used without the other.

18. Frost Engineering was obligated under its arrangement with Samsonite to assign to Samsonite any inventions that Frost or Maguire might make in connection with the can opener project, but it was left to Samsonite to determine what, if anything, it might desire to attempt to patent.

19. During May of 1966, Samsonite requested its patent attorney to make a patentability search relating to the automatic feature referred to in Finding 16, above, and was advised that this automatic feature had been developed by Frost and Maguire; but no search was requested or made with respect to the removable cutter-carrying arm feature.

20. During a conference in the late summer or early fall of 1966, Samsonite requested its patent attorney to proceed with a patent application on Samsonite's can opener design and for this purpose he was shown a model and furnished a set of production drawings of the can opener. Some of these drawings showed on their face that they were made by

Frost Engineering and others similarly showed they were made by Samsonite's (Schwayder Bros.) own engineering department. Samsonite instructed its patent attorney not to include in the application the automatic feature developed by Frost Engineering, on which he had previously made a search. Neither during that conference nor otherwise did Samsonite tell its patent attorney, nor did its patent attorney make any inquiry of Samsonite, concerning the identity of the inventors of any subject matter for which a patent was to be sought by the requested application. Samsonite's patent attorney (frankly admitted that he) simply "assumed" that Frost and Maguire were the inventors of the subject matter to be included in the application.

21. During the fall of 1966, Design West's President Fujioka met with Halsted, who had left the employ of Design West in June of 1966, and told Halsted that Samsonite might be going ahead with a patent application on the can opener. The origin of the removable cutter-carrying arm feature was then discussed, and Halsted was told that Design West might need to communicate further with him in connection with the matter.

22. Samsonite's patent attorney prepared the patent application from which the patent before the Court matured, including a number of original claims directed to the removable cutter-carrying arm feature, in the names of Frost and Maguire as joint inventors. Frost and Maguire executed the oath forming a part of the application as joint inventors of its subject matter on January 23, 1967. The application was filed in the U. S. Patent Office on January 30, 1967, in the names of Frost and Maguire as

joint inventors. An attempted assignment of the patent application from Frost and Maguire to Samsonite was forwarded to the Patent Office along with the application, but was found to have been defectively executed and was returned by the Patent Office to Samsonite's patent attorney as unsuitable for recording. Nonetheless Samsonite was the owner of the alleged invention sought to be patented.[1]

23. On February 8, 1967, Design West's President Fujioka, who had apparently then seen a copy of the application as filed, wrote to Samsonite indicating that Halsted and Uyeda were the inventors of the removable cutter-carrying arm feature and should be so identified in the patent application. On February 16, 1967, less than three weeks after the application was filed, Samsonite's Director of Product Engineering Fynewever sent to both Samsonite's General Counsel and its patent attorney a copy of Fujioka's letter along with a memorandum emphasizing the importance of the removable arm feature, stating that Halsted and Uyeda should be named as inventors of such feature, and recommending that either the application already filed be so amended for such purposes or an additional application on the removable arm feature be filed in the names of Halsted and Uyeda as inventors thereof. No action was taken immediately on this recommendation.

24. Sometime during the six month's period following notification of Samsonite's General Counsel and its patent attorney of the inventorship defect in the pending application, the patent attorney conferred with executives of Samsonite and suggested that the problem might be handled by replacing the pending appli-

1. Samsonite, as the corporation employing Design West and through it Halsted and Uyeda, the inventors who made the invention during their term of service, is the owner of the invention of Halsted and Uyeda. 1 Deller's Walker on Patents, 2nd ed., § 37 p. 176. And as assignee of the patent rights of Frost, Maguire and Frost Engineering, acting on behalf of all the inventors, Samsonite and its attorney were agents for all the inventors (1 Deller's Walker on Patents, supra, § 38 p. 179) who are for that reason chargeable in law with the deceptive intention of Samsonite and its attorney in omitting two of the inventors in the original application, and also in concealing the failure to name in the application all of the inventors.

cation with a continuation-in-part application adding the automatic feature invented by Frost and Maguire to the subject matter of the pending application and also adding the names of Halsted and Uyeda as joint inventors. During late July of 1967, Samsonite instructed its patent attorney to "hold up" on filing any application on the automatic feature until the can opener, which by then was being offered under the pending application, had been successfully sold, but no action was taken to correct the defect in the pending application directly.

25. On November 24, 1967, more than nine months after Samsonite and its patent attorney were first advised of the inventorship defect in the pending application, the patent attorney forwarded to Samsonite's General Counsel a copy of an official action that had been received from the Patent Office Examiner, allowing certain claims of the application directed to the removable cutter-carrying arm feature and rejecting others, with a letter commenting on the importance of the removable arm feature, recalling the inventorship problem, and stating that steps to add Halsted and Uyeda to the pending application had been deferred awaiting decision as to whether a continuation-in-part application directed to the automatic feature was to be filed. But no action to correct the inventorship defect in any manner was actually taken at that time.

26. On January 19, 1968, approximately 11 months after notice that the real inventors of the removable arm feature were not named in the pending application, Samsonite's patent attorney prepared and forwarded to the Patent Office a written amendment presenting and urging the allowability of a new claim, broadly directed to the removable cutter-carrying arm feature. (This new claim ultimately became Claim 2 of the patent.) But no mention was made therein to the Patent Office that the persons believed to be inventors of such subject matter of the new claim had filed no oaths and were not even named in the application. On the same day, Samsonite's patent attorney sent a copy of the amendment to its General Counsel, with a letter mentioning the inventorship defect in the application.

27. On May 24, 1968, more than 15 months after Samsonite, its General Counsel and its patent attorney had become aware of the failure of the pending application to include the real inventors of what was referred to in their correspondence as one of the most important features of its subject matter, the Patent Office Examiner handling the application telephoned Samsonite's patent attorney to suggest certain minor changes in the application and to indicate that the application, including the claim that became Claim 2 of the patent, would be allowed upon approval by the attorney of the suggested changes. Samsonite's attorney approved the changes, but even then did not advise the Patent Office Examiner of the defect in the application or any plans to correct the defect.

28. On August 14, 1968, over 18 months after first knowledge of the defect in the description of the inventors, Samsonite's patent attorney forwarded to Samsonite the official notice of allowance of the application from the Patent Office, with a letter referring to his assumption that there had been no change in Samsonite's decision "that it will not be necessary to refile this application, . . ." No action for correction of the defect was taken, although issuance of the patent containing a defect in the description of the inventors was becoming imminent, and both Samsonite and its patent attorney were still aware of this defect.

29. By mid-1968, the can openers had been made and offered for sale by Samsonite under the application, a specimen of which is before the Court as Defendant's Exhibit 11. The offering for sale had proved commercially to be what its Vice President of Marketing characterized as "If it was not a disaster, that's about as close to one as we would like to come." By late 1968 or early 1969,

Samsonite had decided to get out of the can opener business entirely.

30. On January 30, 1969, almost 2 years after the defect in the description of inventors became known to Samsonite and its attorneys, the patent was issued to Frost and Maguire as patentees and purported joint inventors of the subject matter claimed therein, including the removable cutter-carrying arm feature covered by Claim 2. The patent was also initially issued by the Patent Office to Frost and Maguire as the legal owners of record thereof, since no satisfactory assignment to Samsonite had ever been recorded. Subsequently, an assignment of the patent from Frost and Maguire to Samsonite was executed and recorded in the title records of the Patent Office.

31. After extended and unsuccessful solicitation and attempts by Samsonite to sell its can opener production tooling, inventory and the patent to numerous other appliance manufacturers, it contracted, on November 7, 1969, to sell these properties to plaintiff at a minor fraction of the cost to Samsonite of tooling alone. Plaintiff was not advised by Samsonite of the defect in the description of the inventors in the patent at or before the time of its sale or transfer to plaintiff. The plaintiff did not become aware of the defect until it was disclosed by the discovery in this action.

32. It is not disputed that plaintiff filed in this Court its Application for Order to the Commissioner, with reasonable diligence after discovering the defect in the patent. Specifically, that Application seeks an order directing the Commissioner of Patents to issue a certificate naming Milton J. Halsted and Tim M. Uyeda as joint inventors with the original patentees Frost and Maguire of the subject matter covered by the patent. Plaintiff urges that its Application should be granted as a matter of course because the defect is one of simple omission to join joint inventors resulting from mere error and without deceptive intent on the part of Halsted or Uyeda.

33. Defendant has opposed plaintiff's Application on the grounds that the statute invoked does not apply when (1) the alleged inventions of different inventors were separate and distinct in nature rather than joint; (2) nor where the subsisting defect is the result of deliberate and informed decisions or conduct rather than ignorance, inadvertence or mistake; (3) nor where the subsisting defect involved fraud, concealment or conscious disregard of known legal requirements rather than bona fide error; (4) nor where the defect has long subsisted because of a gross lack of diligence or intentional delay on the part of those having knowledge of its existence and the power to correct it. Defendant has also questioned whether, in any event, the order sought by plaintiff would serve any useful or equitable purpose in view of certain testimony of the alleged inventors and alleged prior publications, patents and uses urged by defendant to show lack of invention of the removable cutter-carrying arm feature covered by Claim 2 of the patent. But that issue is not deemed to be ripe or necessary for decision on the matter of plaintiff's Application under Title 35, U.S.Code, Section 256. The use of the words "inventors", "inventorship defect" and "invention" herein is not intended to include this issue.

34. Plaintiff correctly contends that the three prerequisites for relief under Section 256 are as follows:

(1) that an omitted person was a joint inventor,

(2) that the person was omitted by error,

(3) that the omitted person was omitted without deceptive intention on the part of the person.

These prerequisites are set forth in the text of Section 256, and in the opinion in Hamilton Cosco v. Century (D. Ohio) 305 F.Supp. 1271.

35. Although the initial failure of Samsonite and its attorneys to inquire or determine who invented what inventions and to then file an appropriate ap-

plication or applications in the names of the proper parties may well come within the ambit of inadvertence or mistake resulting from regrettable but excusable good faith inattention to detail, what occurred between the discovery of the defect in February of 1967 and the issue of the defective patent in January of 1969, and from then until its sale to plaintiff in November of 1969, presents an inexcusable deliberate failure to disclose to the Patent Office the names of the inventors of the cutter-carrying removable arm. The following circumstances support this conclusion: (a) the continued inaction and failure of Samsonite and its attorneys, with full knowledge of the inventorship defect and appreciation of its significance, to take the corrective action known to them to be both available and necessary to avoid the wrongful issuance and later the exercise of an unlawfully procured patent, during more than 22 months of prosecuting an application, known to be defective, before the Patent Office; (b) another more than 9 months of holding and offering a patent, known to be defective, for sale to numerous members of the public in a deliberate course of conduct involving intentional delay; and (c) concealment of material facts in disregard of the known patent laws and Patent Office practices resulting in a serious fraud upon the Patent Office and the public.

The proffered explanation of Samsonite's patent attorney that he eventually "overlooked" the matter of the defect is insufficient to excuse either the fact of the long and deliberate failure of him and Samsonite to disclose information required by law to be disclosed or the consequences of that conduct. One answer to this purported excuse of counsel for Samsonite is that Samsonite is responsible for all the errors of omission of its authorized agents, officers, employees and attorneys. So are the purported inventors Frost and Maguire, the applicants whom he represented.

36. The execution of application oaths by patentees Frost and Maguire as joint inventors of an application claiming the removable cutter-carrying arm feature, when each of them knew that neither of them conceived this feature was calculated to and did deceive the Patent Office. To the extent that the false statement was attributable to Samsonite and its attorney, the affiants were responsible for the actions of Samsonite and its attorney as well as for their personal actions in executing a false oath intended to deceive.

37. The long silence of Halsted and Uyeda in not actively asserting any rights they might have as inventors between February 8, 1967, and the occurrence of discovery in this action during the summer or fall of 1970 may be understandable because of their lack of direct proprietary or financial interest in any patent rights arising from their employment at Design West, and probably the result primarily of apathy and lack of interest. This apathy and lack of interest is not calculated now to provide grounds for protection of any interest they now might claim. Although given formal notice of the hearing in this case they have not appeared and made personal claims of right. Samsonite and its attorney were acting for all the alleged inventors and also itself in presenting the application for the patent, and the inventors are responsible with the deceptive intention of Samsonite and its attorney.

## CONCLUSIONS OF LAW

38. Jurisdiction of the subject matter of this action exists under Title 28, U.S.Code, Section 1338, and of plaintiff's Application under Title 35, U.S. Code, Section 256, and of the parties to the action. Notice and opportunity to be heard on plaintiff's Application have been given to the parties and other interested persons who might have some direct interest in the patent, as noted above.

39. Title 35, U.S.Code, Section 116, and Rule 1.45, Rules of Practice in Patent Cases, as amended, made pursuant thereto, provide a convenient adminis-

trative method for correcting virtually any type of error in joinder or non-joinder of inventors without any deceptive intention in pending patent applications by amendment, provided the corrective amendment is shown to be diligently made following discovery of the error. For example see Application of Schmidt, 293 F.2d 274, 48 CCPA 1140 (1961).

40. Title 35, U.S.Code, requires throughout its provisions that patents shall be sought and obtained only in the names and upon the oaths of the true inventors. See: Title 35, U.S.Code, Sections 101, 102(f), 111, 115, 116, 151, 256, for example.

■ 41. Patents issued in the names of persons other than all of the true inventors, unless the circumstances warrant correction under Title 35, U.S.Code, Section 256, are invalid. Smart v. Wright, 227 F. 84, 141 CCPA 632 (C.A.8 1915); 1 Deller's Walker on Patents, 2nd ed., § 31 at page 166.

42. Under the third paragraph of Title 35, U.S.Code, Section 256, providing for the correction of errors in joinder of inventors in issued patents upon the order of a court, the granting of the order for correction is made subject to satisfaction of all of the substantive and procedural requirements of either the first or second paragraphs of Section 256 and then still left as a matter for the sound discretion of a court in the exercise of its equitable powers.

43. The requirements of the second paragraph of Title 35, U.S.Code, Section 256, and Rules promulgated thereunder, relating to correction of a defect involving an omission of joint inventors from an issued patent, provide that (a) all of the persons to be named after the correction will be true *joint* inventors, (b) the defect shall have occurred by "error", (c) the defect shall have occurred without "deceptive intention", and (d) diligence be shown in seeking the correction as soon as reasonably possible after the defect is discovered.

■ 44. The burden of showing that, under all of the relevant circum-

stances, the Court should order the correction sought, is on plaintiff as the party applying to the Court for relief. This burden has not been met by plaintiff.

■ 45. Functionally independent mechanical features that are properly made the subject of separate claims in a patent, although incorporated in a single machine, remain separate and distinct inventions. This is particularly the rule when the features are separately invented by different persons at different times and places without active communication or collaboration of effort between them upon the same subject, and cannot be deemed to constitute joint inventions jointly invented by all of those persons who separately conceived such independent features. De Laski & Thropp Circular Woven Tire Co. v. William R. Thropp & Sons Co., 218 F. 458, 464 (D.N.J.1914), affmd. 226 F. 941, 947, 141 CCPA 545 (C.A.3 1915).

■ 46. The removable arm feature covered by Claim 2 and a number of other claims of the patent and the guide structure feature covered by Claims 1 and 7 of the patent are separate and distinct, rather than joint, alleged inventions. Neither of such features was jointly invented by all of Frost, Maguire, Halsted and Uyeda, since the removable arm feature having been conceived by Halsted and Uyeda, and the guide structure feature was later conceived by Frost and Maguire.

■ 47. Title 35, U.S.Code, Section 256, is limited to the correction of errors involving true joint inventorship and does not contemplate or permit what would amount to substitution of one inventor entity for another under the guise of "correction", which would occur with respect to Claim 2 and other of the removable arm claims if plaintiff's Application were to be granted. Koehring Company v. Etnyre & Company, 254 F. Supp. 334 (N.D.Ill.1966).

■ 48. The requirement of Title 35, U.S.Code, Section 256, that a correctable defect must be the result of "error"

does not extend its remedy to defects resulting from deliberate decisions, intentional courses of misconduct or gross negligence in avoidance of correction on the part of responsible knowledgeable parties having full notice of the facts and their legal significance. John Blue Co. v. Dempster Mills, 172 F.Supp. 23 (D.Nebr.1958), affmd. other gnds. 275 F.2d 668 (C.A.8 1960).

49. Although the requirement of Title 35, U.S.Code, Section 256, that a correctable defect must be "without deceptive intention" is phrased in terms of "on his part", such reference must, both logically and as a matter of ordinary construction, be understood to mean on the part of the inventor(s), their employers, or their privies in interest, including any attorneys acting on behalf of the applicant for the patent in question. The few authorities that have considered and applied Section 256 to particular facts clearly do not appear to have limited their factual inquiry concerning conduct only to an omitted inventor. John Blue Co. v. Dempster Mills, *supra.*

50. Fraudulent motivation may be found in omissions or concealments involving a breach of legal duty, and often can be inferred from the circumstances. Connolly v. Gishwiller, 162 F.2d 428 (C.A.7 1947).

51. Patents are inherently affected with a public interest in seeing that patent monopolies spring from backgrounds free of fraud, concealment of material facts or other inequitable conduct. Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). Deceptive intention inferred from concealment is inequitable conduct expressly recognized by Section 256 in the use of the words "without deceptive intention."

52. The identification of the true inventors is a material fact essential to the issuance of a valid patent. The long concealment from the Patent Office by Samsonite and its attorneys of a material fact, the true identity of the alleged inventors of the removable arm feature covered by Claim 2 and other claims of the patent, amounted to fraud and lack of good faith. Monsanto Company v. Rohm and Haas Co., 312 F.Supp. 778, modif. 312 F.Supp. 798 (E.D.Pa. 1970) affmd. 456 F.2d 592, cert. denied 407 U.S. 934, 92 S.Ct. 2463, 32 L.Ed.2d 817. Fraud is the equivalent of "deceptive intention" under Section 256.

53. The deliberate delay and long inaction of Samsonite and its attorneys, consummated by their ultimate failure to act at all, is inconsistent with the good faith and diligence required for application of Title 35, U.S.Code, Section 256.

54. Plaintiff, as successor in interest to the patent by assignment from Samsonite, is in privity with Samsonite and its title is subject to the infirmities of the title of Samsonite. Because of the public interest plaintiff is now bound by all of the inequitable and deceptive conduct and lack of diligence of Samsonite, its predecessor in interest and the attorneys who acted for such predecessor in knowingly securing the issuance of the patent while concealing material facts from the Patent Office contrary to law and equity.

It is therefore

Ordered that plaintiff's Application for Order to Commissioner filed November 3, 1970, is denied. Because the invalidity of the patent is established by this ruling, it is further

Ordered and adjudged that judgment be, and it is hereby, entered in favor of the defendant upon the first count ("Cause of Action") of plaintiff's complaint. It is further determined pursuant to Rule 54(b), F.R.Civ.P., that there is no just reason for delay of entry of this judgment on Count I of the complaint. It is therefore

Ordered that this final judgment on Count I be entered on this day.