**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

JULES J. LEVIN; ROGER P. LEVIN;
STACEY W. LEVIN,
                    *Plaintiffs-Appellants,*

v.

SEPTODONT, INCORPORATED,
                    *Defendant-Appellee.*

No. 00-2234

JULES J. LEVIN; ROGER P. LEVIN;
STACEY W. LEVIN,
                    *Plaintiffs-Appellants,*

v.

SEPTODONT, INCORPORATED,
                    *Defendant-Appellee.*

No. 00-2462

JULES J. LEVIN; ROGER P. LEVIN;
STACEY W. LEVIN,
                    *Plaintiffs-Appellees,*

v.

SEPTODONT, INCORPORATED,
                    *Defendant-Appellant.*

No. 01-1852

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, District Judge.
(CA-99-647)

Argued: October 31, 2001

Decided: April 22, 2002

Before MICHAEL, MOTZ, and KING, Circuit Judges.

Affirmed in part, vacated in part, and remanded by unpublished opinion. Judge Michael wrote the opinion, in which Judge King joined. Judge Motz wrote an opinion concurring in part and concurring in the judgment.

**COUNSEL**

**ARGUED:** Howard Gary Goldberg, GOLDBERG, PIKE & BESCHE, P.C., Baltimore, Maryland, for Appellants. Barbara Susan Wahl, Melissa Callahan Lesmes, ARENT, FOX, KINTER, PLOTKIN & KAHN, P.L.L.C., Washington, D.C., for Appellee. **ON BRIEF:** Michael A. Simpson, GOLDBERG, PIKE & BESCHE, P.C., Baltimore, Maryland, for Appellants. Courtney A. Sullivan, ARENT, FOX, KINTER, PLOTKIN & KAHN, P.L.L.C., Washington, D.C., for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

**OPINION**

MICHAEL, Circuit Judge:

On March 18, 1998, plaintiffs-appellants, Jules J. Levin, Roger P. Levin, and Stacey W. Levin (the Levins), agreed to sell to defendant-appellee, Septodont, Inc. (Septodont), a patent for a low irritation anesthetic and antiseptic mouth rinse (the mouth rinse), U.S. Patent No. 5,547,657 (the '657 patent). Septodont terminated its agreement with the Levins on the ground that the mouth rinse had failed to satisfy a contractual requirement that the rinse remain stable over a shelf life of one year. The Levins then sued Septodont for breach of con-

tract and indemnification in the United States District Court for the District of Maryland. The district court granted summary judgment to Septodont on both claims. In dealing with the breach of contract claim, the district court held that the '657 patent was invalid because it failed to name Dr. Donald Kilday as an inventor of the mouth rinse; the court therefore concluded that the agreement between the Levins and Septodont was unenforceable for lack of consideration. Because we conclude that Dr. Kilday's contributions to the development of the mouth rinse do not make him a joint inventor, we vacate the district court's grant of summary judgment to Septodont on the breach of contract claim and remand for further proceedings on that claim. We affirm the district court's grant of summary judgment to Septodont on the Levins' claim for indemnification.

I.

Dr. Jules J. Levin, a retired dentist, first thought of the idea for the mouth rinse while attending a dental trade show in 1992. There, he learned of a product called Ulcerease, a numbing cream that is used to reduce the pain caused by mouth ulcers. Levin thought there might be a market for a mouth rinse that could be used to reduce the pain caused by routine dental procedures. He soon sought help with his idea from Dr. Donald Kilday, the developer of Ulcerease. Dr. Levin told Dr. Kilday that he wished to develop a mouth rinse that, if swished around the mouth of a dental patient, would numb the soft tissues of the mouth for 15 to 20 minutes. After consulting with Dr. Levin, Dr. Kilday considered possible formulations for the product and ultimately settled on using phenol (a key ingredient in Ulcerease) as an antiseptic and benzocaine as an anesthetic. Early formulations of the product used alcohol as a solvent, but this proved unsatisfactory because it produced a burning sensation in patients' mouths. Dr. Kilday recognized that this problem could be solved by suspending the benzocaine and phenol in a non-alcoholic solvent. He initially engaged Harmony Labs to develop a non-alcoholic solvent, but Harmony was unable to find a solution. Dr. Kilday then sought help from Eastman Chemical Company (Eastman). After several months of research, scientists at Eastman discovered that they could suspend phenol and benzocaine in a solution of polyethylene glycol and propylene glycol, thereby producing a mouth rinse that did not cause a burning sensation.

The Eastman scientists believed that the new, non-alcoholic mouth rinse was patentable. The Levins and Eastman agreed that Eastman would handle the patent application process for the mouth rinse and that the assignee (the record owner) of the patent would be Eastman. The Levins (through their company, J. Coleman, Inc.) received an exclusive license to use the patent with an option to have the patent assigned to it free of charge at any time. This arrangement had two important advantages for the Levins. First, Eastman bore the expense of preparing the patent application. Second, having the patent issued to Eastman rather than to Dr. Kilday or Dr. Levin would better deter potential infringers of the mouth rinse patent.

The Patent Office initially rejected Eastman's patent application on the ground that the mouth rinse was obvious in light of the prior art. *See* 35 U.S.C. § 103. Eastman then amended its application to limit the scope of its claims and to emphasize that the mouth rinse's use of a non-alcoholic, non-irritating solvent was a non-obvious contribution to the field. On August 20, 1996, the Patent Office allowed Eastman's patent application and issued U.S. Patent No. 5,547,657 for a low-irritation anesthetic and antiseptic mouth rinse. Five Eastman scientists were listed as the inventors of the mouth rinse, and Eastman was listed as the patent's assignee.

With the '657 patent in hand, the Levins set out to find a company to manufacture and market their mouth rinse. After unsuccessful discussions with a number of potential business partners, the Levins found a willing partner in Septodont, a dental marketing company and a distributor of dental products. Under the terms of their March 18, 1998 agreement, the Levins agreed to assign the '657 patent to Septodont and to give Septodont the exclusive right to manufacture and sell the mouth rinse. In return Septodont agreed to pay the Levins $50,000 upon the signing of the agreement, $500,000 at least 10 days prior to the launch date for the mouth rinse, additional guaranteed payments of varying amounts until the end of the patent term, and variable payments based on a percentage of Septodont's net sales for the mouth rinse. The contract also obligated the Levins to pay for a stability test on the mouth rinse, and it gave Septodont the right to terminate the agreement and to receive a refund of all payments made to the Levins if the results of the stability test indicated that the shelf life of the product would be less than one year. The contract also included a

general indemnity provision, which stated that Septodont would "indemnify and hold harmless [the Levins] against any and all lapses, fees, cost, claims, expenses and/or litigation, including reasonable attorneys' fees and expenses, incurred as a result of any alleged or actual use or misuse of the [mouth rinse] or as a result of the transactions contemplated by this Agreement."

Septodont began experimenting with various coloring and flavoring agents in order to ready the mouth rinse for launch, but it claims that the mouth rinse changed color after a few months. Septodont then terminated its contract with the Levins on the ground that the product had failed to meet the contract's stability requirement. The Levins sued for breach of contract in the United States District Court for the District of Maryland, invoking that court's diversity jurisdiction under 28 U.S.C. § 1332(a)(1). The Levins also claimed indemnification for the expenses of the lawsuit on the ground that their contract with Septodont obligated Septodont to reimburse them for all litigation expenses incurred "as the result of the transactions contemplated by this Agreement." Septodont filed various counterclaims, including a claim for a declaratory judgment that the '657 patent was invalid because it failed to list Dr. Levin and Dr. Kilday as inventors of the mouth rinse. Septodont also argued the invalidity of the '657 patent as an affirmative defense to the Levins' breach of contract claim, contending that the contract was unenforceable for lack of consideration because the Levins had failed to convey valid patent rights.

After discovery Septodont moved for summary judgment on the Levins' breach of contract and indemnification claims. The district court granted the motion on both counts. The court first held that even though Dr. Kilday had not been able to solve the critical problem of finding a non-alcoholic, non-irritating solvent, he was nevertheless a joint inventor of the mouth rinse because he had proposed the rinse's two active ingredients, benzocaine and phenol. The court did not reach the question whether Dr. Levin should also have been listed as an inventor. The court then ruled that the patent could not be corrected to list Dr. Kilday as an inventor under 35 U.S.C. § 256, which allows for correction of the listed inventors on a patent so long as the error arose without "deceptive intent" on the part of the omitted inventor(s). The district court determined that Septodont had demonstrated the presence of deceptive intent by clear and convincing evi-

dence because Dr. Kilday and the Levins had admitted that they made a strategic decision that the patent would be less vulnerable to potential infringers if issued to Eastman rather than to Dr. Kilday. Accordingly, the district court held that the patent was invalid and that the contract between the Levins and Septodont was therefore unenforceable for lack of consideration. The district court also granted summary judgment to Septodont on the Levins' indemnification claim, reasoning that the indemnity clause relied upon by the Levins could not reasonably be read to cover the costs of a lawsuit between the contracting parties.

Subsequently, Septodont filed a motion for attorney fees under 25 U.S.C. § 285, which authorizes courts to award attorney fees to the "prevailing party" in "exceptional" patent cases. The Levins moved to strike the motion as untimely, arguing that it was filed after the deadlines imposed by Rule 54(b)(2) and Local Rule 109.2. The district court granted their motion over Septodont's objection. *Levin v. Septodont, Inc.*, 2001 WL 224834 (D. Md. Feb. 16, 2001). The court noted in a footnote that it would also have denied the motion on the merits, as it did not find the Levins' conduct to be sufficiently "exceptional" to merit an award of attorney fees. *Id.* at *2 n.1.

The Levins appealed to this court on the breach of contract and indemnification claims. Septodont filed a motion to dismiss the Levins' appeal for lack of jurisdiction, but we denied the motion in an order issued on April 18, 2001. Septodont appeals the district court's dismissal of its petition for attorney fees as untimely. We have jurisdiction under 28 U.S.C. §§ 1291 and 1294(1).

II.

Our review of the district court's grant of summary judgment is de novo. *Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.*, 148 F.3d 417, 420 (4th Cir. 1998). Summary judgment is warranted when there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Levins conceded below that their contract with Septodont is unenforceable for lack of consideration if the '657 patent is invalid. Thus, the issues in our review of the district court's ruling on the breach of contract claim are (1) whether Dr. Kilday is an inventor

of the mouth rinse and, if so, (2) whether his erroneous omission from the patent can be corrected under 35 U.S.C. § 256. We first address the district's court's decision that Dr. Kilday is an inventor of the mouth rinse.

Under 35 U.S.C. § 116 a patented invention may be the work of two or more joint inventors. Failure to name all the true inventors will invalidate a patent under 35 U.S.C. § 102(f), *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1349-50 (Fed. Cir. 1998), unless the patent's list of inventors can be corrected under 35 U.S.C. § 256, *id.* at 1350. Once a patent is issued, however, its list of inventors is presumed to be correct. *Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997). Attacks on the validity of a patent based on errors in the list of inventors are considered technical defenses and are disfavored. *See General Motors Corp. v. Toyota Motor Co.*, 667 F.2d 504, 507 (6th Cir. 1981). A party attacking the patent on the ground that it fails to name a true inventor must prove that claim by clear and convincing evidence. *Hess*, 106 F.3d at 980. Here, the facts about the contributions of Dr. Kilday (and Dr. Levin) to the development of the mouth rinse are essentially undisputed. Dr. Levin had the original idea for a rinse that could be used to numb the mouth during dental procedures. Dr. Kilday suggested that benzocaine and phenol would be appropriate active ingredients for such a rinse, and he suggested the rough proportions of those ingredients that were used throughout the development process. In addition, Dr. Kilday recognized that the use of alcohol as a solvent caused an unpleasant burning sensation in patients' mouths and went to Eastman for help in solving the problem of developing a non-alcoholic solvent. The critical question in this case is whether the district court erred by ruling that these facts make Dr. Kilday an inventor of the mouth rinse as a matter of law. *See Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998) (explaining that inventorship is a question of law to be reviewed "without deference").

To invent something, in the lexicon of patent law, is to conceive it. *See Burroughs Wellcome Co. v. Barr Lab., Inc.*, 40 F.3d 1223, 1227-28 (Fed. Cir. 1994) (stating that "[c]onception is the touchstone of inventorship"). Conception is "the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." *Id.* at 1228

(internal quotation marks and citation omitted). An idea is "definite and permanent" when "only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation." *Id.* Here, the patented mouth rinse was not fully conceived until the Eastman scientists figured out how to dissolve the active ingredients suggested by Dr. Kilday by using polyethylene glycol and propylene glycol, for it was only at this point that a person of ordinary skill in the relevant arts would have known how to make the complete mouth rinse. Thus, Dr. Kilday was clearly not the sole inventor of the mouth rinse because he had not formed "a definite and permanent idea of the complete and operative invention." *Id.* Nevertheless, he may still be a joint inventor of the mouth rinse under 35 U.S.C. § 116 because "it is not necessary that the entire inventive concept . . . occur to each of the joint inventors." *Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co.*, 973 F.2d 911, 916 (Fed. Cir. 1992) (internal quotation marks and citation omitted).

A joint invention is "the product of a collaboration between two or more persons working together to solve the problem addressed." *Burroughs Wellcome*, 40 F.3d at 1227. Congress adopted more flexible requirements for joint inventorship in 1984 in an effort to recognize the realities of modern, team research efforts. *See* Patent Law Amendments Act of 1984, Pub. L. No. 98-622, § 104(a), 98 Stat. 3383, 3384-85. The current statute is meant to encompass a wide range of collaborative relationships:

> Inventors may apply for a patent jointly even though (1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a contribution to the subject matter of every claim of the patent.

35 U.S.C. § 116. The Federal Circuit has explained that a joint inventor must:

> (1) contribute in some significant manner to the conception or reduction to practice of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely

explain to the real inventors well-known concepts and/or the current state of the art.

*Pannu*, 155 F.3d at 1351. We must decide whether Dr. Kilday's contributions to the development of the mouth rinse make him a joint inventor under the *Pannu* standard. The question is a close one, and our task is made more difficult because the parties have advanced conflicting views about what this standard means.

Septodont suggests that because "the critical question [of joint inventorship] is who conceived, as that term is used in the patent law, the subject matter of the claims [in the patent]," *Ethicon*, 135 F.3d at 1460, our task is simply to determine "whether [Dr. Kilday's contribution to the mouth rinse] appears in the claimed invention," *id.* at 1461. Applying this standard, Septodont argues that Dr. Kilday must be an inventor because the '657 patent claims his proposed active ingredients, benzocaine and phenol, as essential components of the mouth rinse. The first eleven claims of the '657 patent describe different versions of a mouth rinse consisting essentially of (A) "a topical anesthetic selected from the group including amethocaine, benzocaine, cocaine, and their acid addition salts," (B) "polyethylene glycol having a number average molecular weight of 200 to 300," (C) an "aromatic organic antiseptic compound having one or more hydroxy groups attached directly to the benzene ring [e.g., phenol]", and (for many of the claims) (D), "a solvent selected from the group consisting of 1,2-propylene glycol, glycerol, and combinations thereof." While the claims for components (A) and (C) of the mouth rinse include a wider range of substances than benzocaine and phenol, the description of the invention in the patent states that "preferably" the topical anesthetic (component (A)) of the mouth rinse is benzocaine and the antiseptic compound (component (C)) is phenol. Further, claim 4 of the '657 patent specifically claims a version of the mouth rinse where the topical anesthetic is benzocaine and claim 5 specifically claims a version of the mouth rinse where the antiseptic compound is phenol. A significant contribution to even a single claim of a patent is enough to qualify a person as a joint inventor. *Ethicon*, 135 F.3d at 1460. In light of these points, Septodont concludes that Dr. Kilday must have made a "significant contribution" to the conception of the mouth rinse under *Pannu* because benzocaine and phenol figure prominently in the claims of the '657 patent. The district court seems to have

accepted this reasoning. It observed that although the Eastman scientists solved the more difficult problem of developing a non-alcoholic solvent, "[i]t seems counterintuitive, at best, to argue that the individual that contributed the active ingredients to a new formula should not be considered an inventor while the contributors of the solvents in which those active ingredients were dissolved are so considered." In short, the district court reasoned that Dr. Kilday must be an inventor because the patent claims a mouth rinse that consists in large part of ingredients suggested by Dr. Kilday.

The Levins agree that Dr. Kilday suggested the active ingredients for the mouth rinse and identified the problem of developing a non-alcoholic solvent that would eliminate the burning sensation caused by early formulations of the mouth rinse. In their view, however, the fact that Dr. Kilday's contributions appear in the claims for the mouth rinse is not enough to make him a joint inventor under *Pannu*: "Dr. Kilday's suggestion of benzocaine and phenol as active ingredients was insignificant when measured against the full dimension of the patented oral rinse because it was not what made the invention non-obvious and thus subject to patent." Appellant's Brief at 29. The Levins suggest, then, that whether a contribution counts as "significant" under the *Pannu* standard for joint inventorship depends on the extent to which the contribution makes the invention patentable by making it novel (as required by 35 U.S.C. § 102) or non-obvious (as required by 35 U.S.C. § 103).

We agree with the Levins that the significance of an alleged joint inventor's contribution should be assessed by asking whether the contribution helped to make the invention patentable. Although the language of *Ethicon* appears to offer some support for Septodont's position, the case law suggests that courts do not draw their conclusions about inventorship simply by looking to see whether an alleged joint inventor's contributions appear in the language of the patent's claims. For example, *Hess* involved an engineer at Raychem Corp. who argued that he should have been named as a co-inventor of a balloon angioplasty catheter. The engineer had suggested that the named inventors employ a special type of tubing manufactured by Raychem in the catheter. The named inventors accepted the engineer's suggestion, and the patent for the catheter (U.S. Patent No. 4,323,071) explicitly refers to the Raychem tubing. Even though the Raychem

engineer's contribution to the patented catheter appeared in the claims, the Federal Circuit ruled that he was not an inventor because he was "doing nothing more than explaining to the inventors what the then state of the art was and supplying a product to them for use in their invention." *Hess*, 106 F.3d at 981 (internal quotation marks omitted). The engineer relied in part on an 1914 case which suggested that anyone who "'contributes an independent part of the entire invention, which is united with the parts produced by [others] and creates the whole . . . is a joint inventor, even though his contribution be of comparatively minor importance and merely the application of an old idea.'" *Id.* (quoting *DeLaski & Thropp Circular Woven Tire Co. v. William R. Thropp & Sons Co.*, 218 F. 458, 464 (D. N.J. 1914), *aff'd* 226 F. 941 (3d Cir. 1915)). This argument is strikingly similar to the position Septodont advances here, yet the Federal Circuit declined to accept the argument and observed that the reasoning of the *DeLaski & Thropp* court appeared to be inconsistent with both Supreme Court and Federal Circuit precedent. *Id.* In *Garrett Corp. v. United States*, 422 F.2d 874 (Ct. Cl. 1970), the court considered an argument that claim 3 of a patent on a boarding ramp for inflatable life rafts (U.S. Patent No. 2,914,779) was invalid for failure to join an inventor. The evidence of the alleged co-inventor's contributions was unclear, but the court assumed for the sake of argument that he had "suggested the broad idea of a water ballast pocket for use in conjunction with the boarding ramp." *Id.* at 881. Even though the language of claim 3 included a specific reference to "a water ballast pocket at the outer ends of the [inflatable structural] beams [on the sides of the boarding ramp]," the court held that the person who suggested the idea of a water ballast pocket was not a joint inventor because that idea was "obvious in view of the prior art." *Id.* Because the named inventor had conceived and developed the only non-obvious feature of claim 3, the court concluded that he was the sole inventor. *Id.* In the light of *Hess* and *Garrett*, we conclude that the appearance of ingredients suggested by Dr. Kilday in the claims of the '657 patent is not sufficient to make him a joint inventor.

Reflection on the basic principles of patent law also supports our conclusion that a person does not qualify as an inventor simply because his contributions to an invention appear in the claims of the patent. A patentable invention need not be novel and non-obvious in every respect — it is enough if the claimed subject matter is an

improvement over the prior art in one limited respect. *See* 35 U.S.C. § 103(a) (stating that a patent may not be obtained when "the differences between the subject matter sought to be patented and the prior art are such that the *subject matter as a whole* would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains" (emphasis added)); *Structural Rubber Products Co. v. Park Rubber Co.*, 749 F.2d 707, 715-16 (Fed. Cir. 1984) (explaining that 35 U.S.C. § 102 prevents an invention from being patented only when a single reference in the prior art includes every element of the invention). It follows that many elements of an invention described in a patent claim will be neither novel nor non-obvious. *See, e.g.*, *Garrett*, 422 F.2d at 879-80 (explaining that a patent claim describing a boarding ramp for an inflatable life ramp was valid even though most of the elements comprising the claim were obvious in light of the prior art); *Rival Mfg. Co. v. Dazey Products Co.*, 358 F.Supp. 91, 94 (W.D. Mo. 1973) (explaining that only one of the six elements in a patent claim was "essential to the existence of novelty or invention" while the other five elements were "conventional"). We find it implausible to say that a person who contributed only to the non-novel and/or obvious elements of a claim can be called an inventor. A simple example illustrates the point. The claims of a patent for the proverbial "better mousetrap" would necessarily include many elements that were present in ordinary, non-patentable mousetraps, but surely the only inventor of the new mousetrap is the person who conceived the features that made the new mousetrap an improvement over prior art. A person who told the real inventor about the features of existing mousetraps and their shortcomings is not an inventor because he does no more than explain "well-known concepts and/or the current state of the art." *Pannu*, 155 F.3d at 1351.

In sum, we hold that the significance of an alleged joint inventor's contribution under *Pannu* depends on whether that contribution helped to make the invention patentable. Here, Dr. Kilday's undisputed contributions were identifying the need to develop a non-alcoholic solvent and selecting benzocaine and phenol to be the active ingredients in the mouth rinse. Neither is sufficient to make him a joint inventor.

We have little doubt that Dr. Kilday's recognition of the need to develop a non-alcoholic solvent for the mouth rinse is not enough to

make him an inventor. "One who merely suggests an idea of a result to be accomplished, rather than means of accomplishing it, is not a joint inventor." *Garrett*, 422 F.2d at 881. *See also Amax Fly Ash Corp. v. United States*, 514 F.2d 1041, 1047 (Ct. Cl. 1975) (stating that the conception required for inventorship "must be more than the realization of a desirable result, and more than a mere hope or expectation" (internal citations omitted)). The harder question is whether Dr. Kilday is a joint inventor because he selected benzocaine and phenol as the active ingredients for the mouth rinse and determined their proper proportions in the mouth rinse formula. The Levins argue that the use of benzocaine and phenol in mouth care products was neither novel nor non-obvious, and that Dr. Kilday did no more than explain the existing state of the art to the scientists at Eastman. Two points support the Levins' claim. First, a tentative Food and Drug Administration (FDA) monograph lists benzocaine and phenol as acceptable ingredients for use in over-the-counter mouth care products that can be sold to the public without FDA approval. *See* Oral Health Care Drug Products For Over-the-Counter Human Use, Tentative Final Monograph, 53 Fed. Reg. 2436 (originally proposed Jan. 27, 1988) (to be codified at 21 C.F.R. pt. 356). Further, the proportions of benzocaine and phenol used in the mouth rinse fall within the ranges approved by the FDA monograph. Although Septodont correctly points out that the FDA monograph does not speak to the question of patentability, the monograph has considerable weight as evidence that the use of benzocaine and phenol in mouth care products was well known. Second, the Levins argue that the prosecution history of the '657 patent indicates that the patent examiner judged the rinse to be non-obvious, and hence patentable, only because of the non-alcoholic solvents. In response, Septodont argues that the use of polyethylene glycol and propylene glycol as solvents was no less common than the use of benzocaine as a topical anesthetic and phenol as an antiseptic. In their view, it is the unique combination of the non-alcoholic solvents, the benzocaine, and the phenol that made the mouth rinse patentable. If Septodont is correct, it follows that Dr. Kilday is a joint inventor under *Pannu* because his contributions were essential to the patentability of the mouth rinse. To settle this disagreement, it will be necessary to review the prosecution history of the '657 patent in some detail.

The initial Eastman patent application claimed a "low-irritation anesthetic and antiseptic mouth rinse which is freeze-thaw stable

comprising" the various components listed above: a topical anesthetic (preferably benzocaine), an antiseptic (preferably phenol), polyethylene glycol, and a solvent "from the group consisting of 1,2-propylene glycol, glycerol, and combinations thereof." The patent examiner initially rejected the application primarily on the ground that the mouth rinse was obvious in light of the prior art. *See* 35 U.S.C. § 103; *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966) (explaining the test for deciding whether an invention is non-obvious under § 103). Eastman then amended its application to emphasize that the innovative aspect of the mouth rinse was the use of polyethylene glycol and propylene glycol as non-alcoholic solvents to suspend the active ingredients (benzocaine and phenol) in liquid form. It changed the language of the claims themselves by adding the word "non-alcoholic" (defined as "free of monohydritic alcohols") to its general description of the mouth rinse. It further substituted the words "consisting essentially of" for "comprising," a change designed to narrow the scope of the claims. No changes were made to the descriptions of the various components that make up the mouth rinse. Eastman argued to the patent examiner that nearly all of the prior art references included some form of monohydritic alcohol as a solvent. Only one of the prior references discussed by the patent examiner included polyethylene glycol without also using some form of monohydritic alcohol. Rencher '802 (U.S. Patent No. 5,192,802) claims a teething gel consisting in part of benzocaine as a topical anesthetic and polyethylene glycol as the diluent. Eastman argued to the patent examiner that Rencher did not make the mouth rinse obvious because there the polyethylene glycol was used to make a gel rather than a liquid. Indeed, the whole point of the Rencher patent was to solve "the inherent challenge of maintaining the localization of the pharmaceutical at the point of contact." U.S. Patent No. 5,192,802. In other words, the function of the polyethylene glycol in the Rencher patent was to hold the benzocaine at a specific spot in the mouth so that its effects could be localized. In contrast, the mouth rinse at issue here was designed as a liquid so that it could be rinsed through the mouth so as to numb all the soft tissues in the mouth. The patent examiner apparently found merit in these arguments, for the Eastman patent application was ultimately allowed on August 20, 1996.

We agree with the Levins that the most plausible interpretation of the prosecution history for the mouth rinse patent is that the patent

examiner regarded the idea of a mouth rinse with benzocaine and phenol to be obvious and only approved the patent when he understood the uniqueness of the non-alcoholic solvent developed by the Eastman engineers. Septodont argues that the use of polyethylene glycol and propylene glycol as solvents is no less common than the use of benzocaine and phenol, but this seems to us to miss the point. The innovation here was not the use of polyethylene glycol and propylene glycol as solvents, but the use of those solvents to suspend benzocaine and phenol in a liquid solution. This is the aspect of the mouth rinse that was not obvious in light of the prior art, and it was solely the contribution of the Eastman scientists. We therefore conclude that the Eastman scientists are properly named on the '657 patent as the sole inventors of the mouth rinse.

In sum, we hold that Dr. Kilday was not a joint inventor under *Pannu* because his contributions did not help to make the mouth rinse patentable. Accordingly, we hold that the '657 patent is not invalid under 35 U.S.C. § 102(f) for failure to name the correct inventors,* and we therefore vacate the district's court grant of summary judgment to Septodont on the Levins' breach of contract claim. On remand, the district court may consider whether Septodont is nevertheless entitled to summary judgment on the breach of contract claim on the ground that the mouth rinse failed the contractual requirement that it remain stable over a shelf life of one year.

In light of our holding that Dr. Kilday is not a joint inventor of the mouth rinse, the question of whether the district court erred in ruling that the patent could not be corrected under 35 U.S.C. § 256 is moot. The question of the timeliness of Septodont's motion for attorney fees

---

*We recognize that the district court failed to reach the question of whether Dr. Levin should have been listed as an inventor of the mouth rinse, but under the circumstances of this case there is no need for the district court to consider this question on remand. There is no dispute that Dr. Kilday's contributions to the mouth rinse were more significant than Dr. Levin's because Dr. Levin did no more than come up with the general idea of developing a mouth rinse to lessen the pain caused by dental procedures. "'An idea of itself is not patentable.'" *Diamond v. Diehr*, 450 U.S. 175, 185 (1981) (quoting *Rubber-Tip Pencil Co. v. Howard*, 20 Wall. 498, 507 (1874)). If, as we have held, Dr. Kilday was not an inventor of the mouth rinse, it follows *a fortiori* that Dr. Levin was not an inventor.

under 35 U.S.C. § 285 is also moot because Septodont is no longer a prevailing party on the patent issues in this case.

### III.

The only remaining question in the case is whether the district court properly granted summary judgment to Septodont on the Levins' claim for indemnification. The Levins argue that their contract with Septodont obligates Septodont to pay the Levins' attorney fees in this case because Septodont agreed to indemnify the Levins "against any and all lapses, fees, cost, claims, expenses and/or litigation, including reasonable attorneys' fees and expenses, incurred . . . as a result of the transactions contemplated by this Agreement." The interpretation of the indemnity clause is governed by Maryland law, which states that a court's task in interpreting contractual language is to determine "what a reasonable person in the position of the parties would have thought it meant." *Auction & Estate Representatives, Inc. v. Ashton*, 731 A.2d 441, 445 (Md. 1999) (internal quotation marks & citation omitted). We agree with the district court that the language relied upon by the Levins is a garden variety indemnification clause and that a reasonable person in the position of the Levins would have understood that the clause was not intended to cover the expenses of litigation between the contracting parties. *Cf. Tony Guiffre Distrib. Co. v. Washington Metro. Area Transit Auth.*, 740 F.2d 295, 298 (4th Cir. 1984) (holding that an indemnity provision in a contract should be read to cover only attorney fees incurred in defending against lawsuits by third parties). Accordingly, we affirm the district court's grant of summary judgment to Septodont on the Levins' claim for indemnification.

### IV.

The district court's grant of summary judgment to Septodont on the Levins' breach of contract claim is vacated, and the case is remanded for further proceedings consistent with this opinion. The court's grant of summary judgment to Septodont on the Levins' indemnification claim is affirmed.

*AFFIRMED IN PART, VACATED*
*IN PART, AND REMANDED*

DIANA GRIBBON MOTZ, Circuit Judge, concurring in part and concurring in the judgment:

I concur in parts I, III, and IV of the majority opinion for the reasons well stated therein. I concur in the result reached in part II of the majority opinion, but not in its rationale.

Although I agree that the district court erred in granting summary judgment to Septodont on the question of whether Dr. Kilday was a joint inventor, unlike the majority, I do not believe that the evidence conclusively establishes that Dr. Kilday's contributions "do not make him a joint inventor," *ante* at 3, and, therefore, that Dr. Kilday "is not a joint inventor of the mouth rinse." *Ante* at 15. As the majority recognizes, the question "is a close one." *Ante* at 9. Nonetheless, or perhaps because of this narrow margin, I would hold only that Septodont failed to establish by clear and convincing evidence, as it must, that Dr. Kilday was, indeed, a joint inventor of the '657 patent. *See Hess v. Advanced Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997) (stating that "[t]he burden of showing misjoinder or nonjoinder of inventors is a heavy one and must be proved by clear and convincing evidence" (internal quotation marks and citation omitted)). The high "clear and convincing" standard must be met to rebut the presumption that a patent's named inventors "are the true and only inventors." *Acromed Corp. v. Sofamor Danek Group, Inc.*, 253 F.3d 1371, 1379 (Fed. Cir. 2001) (citations omitted)). To date, Septodont has failed to meet this demanding standard. For this reason, I agree that we must reverse the grant of summary judgment to Septodont on the breach of contract claim.